Filed 5/5/16  (reposted 5/6/16 to attach unmodified opn.)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | G049785 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. M90941) |
| SIDNEY NATHANIEL LANDAU, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

It is ordered that the opinion filed herein on April 20, 2016, be modified as follows:

1.  On page 1, third full paragraph, delete "Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Brendon W. Marshall and Joshua A. Klein, Deputy Attorneys General, for Plaintiff and Respondent" and replace with "Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, and Joshua A. Klein, Deputy State Solicitor General, for Plaintiff and Respondent."

This modification does not change the judgment. The petition for rehearing is DENIED.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

BEDSWORTH, J.

2

Filed 4/20/16 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049785 |
| v. | (Super. Ct. No. M90941) |
| SIDNEY NATHANIEL LANDAU, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Reversed and remanded.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Brendon W. Marshall and Joshua A. Klein, Deputy Attorneys General, for Plaintiff and Respondent.

In April 2009, appellant Sidney Nathaniel Landau was committed to the Department of State Hospitals (DSH) for an indeterminate term as a sexually violent predator (SVP). (*People v. Landau* (2011) 199 Cal.App.4th 31 (*Landau I*).) We affirmed the judgment on appeal. (*People v. Landau* (2013) 214 Cal.App.4th1 (*Landau II*).) While that appeal was pending, appellant received an annual examination at the hospital. (See Welf. & Inst. Code, § 6605, subd. (a)(1); all undesignated statutory references are to this code.) As a result of the examination, the examiner found appellant was still a pedophile, but concluded he was no longer dangerous and that treatment in a less restrictive setting was in appellant's best interests. (*Landau I*, *supra*, 199 Cal.App.4th at p. 35.) On August 16, 2010, Landau filed a petition in the superior court for his unconditional release. (*Ibid*.; see §§ 6606, 6608.)

Appellant received a jury trial on his petition. The matter was submitted to the jury late in the afternoon on December 5, 2013. On December 18, 2013, the jury concluded appellant remained an SVP within the meaning of section 6600. The court recommitted appellant to the DSH.

Appellant appeals, contending the judgment must be reversed because he was denied equal protection of the law when the court required him to testify at trial for the district attorney; the court erred when it permitted the district attorney's expert witness to testify to "a massive amount of inadmissible hearsay," in violation of the Evidence Code and appellant's right to confrontation; the district attorney committed misconduct in closing argument; the court erroneously instructed the jury; the court erred in refusing to permit appellant to present a claim that he should be conditionally released; and the errors were cumulatively prejudicial. Appellant also raises the specter of ineffective assistance of counsel if issues were not preserved for appeal. We conclude the court prejudicially erred in admitting inadmissible hearsay evidence and reverse the judgment.

4

# I

## FACTS

*District Attorney's Case*

Sid S. (Sid) met appellant in 1969, when Sid was eight years old and went to a Boys' Club basketball game where appellant was the score keeper. Shortly thereafter, appellant called the S. family residence and asked Sid's parents if he could take Sid somewhere. Sid could not remember where appellant wanted to take him. Appellant took Sid to a drive-in theater to see "101 Dalmatians." There, appellant placed Sid on his lap and fondled Sid through the boy's jeans.

Appellant became friendly with Sid's parents and built up their trust. Within a month, Sid was going to appellant's house every weekend. Appellant took Sid on trips Sid's family could not afford. By the time Sid was 10 or 11 years old, there were problems in his parents' marriage and they permitted Sid to spend the night at appellant's house.

Appellant held pool parties at his house. Sid's teammates from sports would go to the parties. Appellant had things at his house that appealed to young boys, like pinball machines, games, candy, an eight-foot projection television, and later on, drugs and alcohol. Sid was 12 years old when he first smoked marijuana at appellant's house. Appellant frequently molested Sid after the boy smoked marijuana.

While Sid was eight, nine, and 10 years old, appellant touched Sid sexually—including masturbation and oral copulation—three to five times a week. Appellant also sodomized Sid and did not stop when Sid said it hurt. During summer vacations, Sid would sometimes spend "days on end" at appellant's house. When Sid was 14 or 15 years old, he moved into appellant's house. He slept in appellant's bed with appellant where he was frequently molested at night. Appellant commonly showed Sid pornography—books, magazines, and movies—as a prelude to acts of molestation.

5

Appellant also took Polaroid photographs of Sid unclothed. On occasion, the photograph showed appellant had zoomed in on Sid's genitals. Appellant had Polaroid nude photographs of other boys Sid knew: Tony, Mark, and Matt. On five to 10 occasions, appellant's molestation of Sid also included other boys as well. On one occasion after a pool party, two boys about the same age as Sid, Carl and Richie, ended up in bed with Sid and appellant, and were molested. On most occasions Sid was not the only boy at the house.

In 1981, appellant photographed David D. (David), a young boy. Sid recalled seeing David at appellant's residence. That same year, police executed a search warrant for appellant's residence. Also in 1981, while Sid was employed by appellant's construction business, he visited appellant in Patton State Hospital. Sid was 20 years old at the time.

Appellant had told Sid not to tell others about their relationship. Sid kept the secret until 2006, when an investigator from the district attorney's office contacted him. Appellant's final molestation of Sid occurred when Sid was about 15 years old.

Appellant had a Siberian Husky that he used to take to a park by his house. Sid said boys were attracted to the dog.

Sid knew Scott C. (Scott) who was about four years older than Sid. In speaking with appellant, Sid learned that Scott had a similar relationship with appellant. Appellant also told Sid that he had had a similar relationship with Jerry T. (Jerry) who was about 10 years older than Sid.

Dr. Park Dietz, a forensic psychiatrist, was retained by the district attorney and was paid approximately $90,000 at the rate of $600 an hour. Dietz testified that he diagnosed appellant with Pedophilia, a desire to have sexual contact with children.

Dietz also diagnosed appellant with Asperger's disorder, a high functioning disorder on the Autism spectrum. The disorder prevents the individual from interacting with other people and developing relationships with peers. Individuals with Asperger's

6

do not have a complete appreciation of others, their emotions, feelings, sensitivities, hopes, and dreams. They lack empathy for others, including their victims. This lack of empathy increases the risk of reoffending.

Dietz said pedophilia is a lifelong condition and its onset usually occurs when the individual (usually a male) is eight to 12 years old. Pedophilia can be treated with certain medications and cognitive behavioral treatment, which can reduce detected reoffending by 25 to 50 percent. The medication is used to block "the effects of testosterone." Appellant, however, has not participated in sex offender treatment at the state hospital. Appellant told Dietz he would start treatment when released, at which point he would move to New York. According to Dietz, appellant's failure to participate in treatment means his risk of reoffending has not been mitigated.

In 2008, appellant told Dietz he had a reduced sex drive due to his prostate cancer treatments. The treatments resulted in less frequent erections and pain during ejaculation. Dietz noted it is normal for a male's testosterone levels to diminish with age. A diminished testosterone level correlates with a diminished sex drive, as "testosterone is the major driver of sexual interest."

Appellant's sex drive returned later 2008, and resulted in increased incidents of masturbation. He no longer had pain during ejaculation. Dietz said this change presents a significant increase in the likelihood appellant would reoffend if released.

Prior to the return of his sex drive, appellant had been present when Dietz testified in 2008 that a male's sex drive "can be significantly increased by taking testosterone." Prior to that time, Dietz found appellant had clipped ads from publications for Viagra. In May 2013, a blood test revealed appellant's testosterone level had risen to 974. Dietz said the normal range for testosterone levels in men over the age of 50 is 212 to 755. Appellant's increased testosterone level was due to hormone therapy treatment wherein appellant received testosterone injections.

7

In Dietz's opinion, testosterone replacement therapy in appellant's case is "a recipe for disaster." Dietz said that should appellant have a strong sex drive and strong erectile function, he would inevitably think about boys again and be tempted by them. Dietz noted, however, it would not be necessary for appellant to have full erectile function restored "in order to reoffend with a boy."

Dietz found appellant's release plans wanting. His main concern was with appellant's plan to ride bicycles, camping, walking, and getting a Siberian Husky. Dietz said those activities are of interest to boys, provide opportunities to meet boys, and appellant needs to avoid such contact. Of particular concern to Dietz was the fact that appellant had used a Siberian Husky in the past to attract boys. One of the boys appellant molested used to walk appellant's Husky for him. Dietz said appellant's plans should include terminating his testosterone replacement therapy and completing the sex education treatment offered at the state hospital.

Dietz did not consider actuarial instruments reliable in calculating the risk of reoffending because they only include detected rates of reoffending. He pointed out that appellant was convicted of molesting two out of 10 identified victims and that he committed the molestations approximately 20 years before being arrested the first time. Additionally, he said such tools do not consider the increased likelihood of reoffending presented by the receipt of testosterone injections.

The district attorney called appellant to the witness stand to testify as the last witness in the People's case-in-chief. Appellant admitted he thought of himself as a pedophile in 2000, prior to his prostate cancer. He admitted that in the 1980s he kept boys' swim trunks at his residence for boys to change into to go swimming. He also admitted he would occasionally be naked in front of boys at his house, and that he liked prepubescent boys at that time. He said he was attracted to their innocence.

Appellant said his sex drive increased when he stopped taking Prozac-type drugs. He said he knows his sex drive decreased while he was on selective serotonin

8

uptake inhibitor (SSRI) depressants and while he had prostate cancer. Appellant began taking testosterone after he stopped taking Fosamex. This contradicted Dr. Jonathan Ashby's testimony that appellant was still taking Fosamex. Appellant believes he started receiving testosterone injections in May 2010, at the suggestion of his treating physician. His last injection was on October 21, 2013, prior to transferring to the Orange County jail for trial. He said the injections help his stamina in exercising, but he does not believe the injections increased his sex drive. Appellant said that since his birthday in June, he has not walked as exercise because he has been in too much pain.

Since recovering from prostate cancer, appellant has masturbated more often. He said he fantasizes about adult females when he does. Prior to his cancer, including after each of two stints in state prison, he fantasized about prepubescent boys when masturbating. Appellant said he does not remember testifying in 2008 that he had zero sex drive. He said that if he testified to that, he was mistaken.

Appellant admitted he was convicted of molesting David in 1981. He said the molestation occurred while watching a pornographic movie with David, after he had groomed David to be molested. Appellant believed that if he properly groomed a boy, the boy would not report him. When the molestation occurred, David dropped his pants, told appellant to "do it," and appellant orally copulated him. Appellant molested David on another occasion before the police got involved after David's father saw appellant with his hand on David's thigh.

Appellant denied recalling statements purportedly made to a probation officer before his sentencing in the matter involving David. He stated that if he told the probation officer the photographs found at his residence were all innocent, that would not have been the truth. Appellant admitted having been committed to Patton State Hospital as "a mentally disordered sex offender," but denied remembering telling doctors at the hospital that the offense with David was his only expression of attraction for boys. Appellant admitted feeling in 1983 that he did not want to be punished anymore and

9

would not reoffend, yet four or five years later he was back in court on another molestation.

Appellant said he remembers his molestation of Gregory S. (Gregory). It resulted in another conviction. He said he does not recall telling Dr. French[1] in 1996 that he had never been sexually active with any child prior to his 1981 arrest, but admitted that had he said it, it would not have been true because he had molested other children. He also admits he had a motive to not be truthful about his sexual history.

Appellant does not remember telling a doctor that his relationship with his "son," meaning Sid, was nonsexual, but that if he did say that, the statement was not truthful, and that he had a motive in 2000 to not be truthful with the doctor evaluating him. Appellant said he lied to keep out of trouble.

Appellant does not recall any conversation with Sid's mother about whether anything inappropriate was happening between him and Sid, but he admitted if any parent asked him, he "lied to every one of them,"

Appellant talked about his 1961 molestation of Jerry, who was eight years old at the time. Appellant was about 22 years old at the time. He said Jerry was living with his mother and brother in Anaheim. Appellant believes he met Jerry while appellant walked his dog. He let Jerry help walk and take care of the dog after school, before appellant got home from work. Appellant took Jerry camping and orally copulated Jerry. He said he probably fantasized about it before he molested Jerry. He molested Jerry over a six-month period. When appellant moved from the apartment complex where he and Jerry's family lived, Jerry and his family moved in with appellant. Appellant continued to molest Jerry for approximately two or three years.

Appellant did not remember how old Scott was when he started molesting him sometime around 1964, but appellant remembers Scott was prepubescent at the time.

---

[1] The record does not contain Dr. French's first name.

Appellant was attracted by Scott's age. Although he does not recall, appellant said he is sure he started grooming Scott "just like all the others" by taking him to fun places and giving him presents. He said he probably molested Scott for several years.

When appellant did not have boys around, he fantasized about them. He took nude photographs of Scott and looked at them when Scott was not around. He also masturbated to photographs of naked children in magazines.

Appellant remembers taking Sid to a drive-in movie, having Sid on his lap, and fondling Sid's genitals. He had nude Polaroid photographs of Sid. He used the photographs to "satisfy" himself when Sid was not around. Appellant admitted orally copulating and sodomizing Sid. He said he continued to molest Sid until Sid was about 15 years old.

Appellant met another of his victim's, David, at a school where appellant walked his Siberian Husky almost every day. He also molested Tony, who was about nine years old, and Carl and Richie, who were both prepubescent. Appellant admitted he had "sex with more than one boy at a time" on occasion. There were times when a molestation was preceded by marijuana or alcohol. He showed David pornography prior to molesting him. Appellant conceded he was still attracted to boys after his first commitment to state prison.

Aaron P.'s (Aaron) father worked for appellant as a plumber when appellant had a swimming pool construction business. Appellant asked Aaron's parents if he could take Aaron on a ski trip. Appellant denied having any sexual interest in Aaron, stating that the boy was too young. Aaron was about five years old. Appellant was interested in boys who were at least eight years old. Once boys reached 13 years old, they were no longer attractive to appellant. Appellant remembers sitting on a couch with Aaron and his mother, rubbing Aaron's thigh and "cuddling him," but he did not recall other details of the incident. Several days later, appellant went to Aaron's house and was arrested for molesting Aaron, which appellant denied. Charges involving Aaron were

11

filed, but eventually dropped. Appellant was involved with other boys at the time, including Gregory and Josh.

Appellant met Gregory in the 1980s while working on a remodel at the S. family residence. He was not immediately attracted to Gregory, but became attracted to him about a year later, at which point appellant began grooming Gregory. He began molesting Gregory on October 31, 1987, and eventually pled guilty to molesting Gregory 18 times from August 1987 to April 1988. Appellant remembers taking Gregory to Catalina one time and orally copulating him. Additionally, appellant may have used his finger to penetrate Gregory's anus.

During the time appellant was involved with the boys, he believed they could consent just as adults can. He now knows they cannot. He admits he did not participate in the treatment program at the state hospital, but said he would not reoffend because he now has the tools to keep himself from reoffending. He said he did not know the harm he caused at the time of the molestations, but he does now.

*Appellant's Case*

Karen Franklin is a forensic psychologist. She evaluated appellant in April 2012. She said appellant had some obsessive-compulsive symptoms, but did not have a severe case of obsessive-compulsive disorder. She said appellant does not have Asperger's disorder or, if he does, it is an extremely mild case. She said he has done things that tend to indicate he does not have Asperger's disorder. For example, he was a good pool salesman and Franklin said she has never known anyone with Asperger's to be a good salesman.

Franklin said appellant met the qualifications for a diagnosis of pedophilia. She found that he has not done anything while in custody to evidence a continued interest in children. There are those individuals who, although in custody, continue to demonstrate an interest in children by smuggling in child pornography, making doodles

12

of young children, or befriending the younger-looking patients, but appellant has not done any of that. After looking at actuarial data, taking appellant's age into consideration, and considering that appellant had not reoffended after being released from prison on after his last offense, Franklin concluded appellant has demonstrated control over himself so as not to molest children.

Franklin stated her belief that appellant "is not likely to reoffend" if released. She said his testosterone replacement therapy does not put appellant into a different risk category. She estimated appellant had a 2.7 to 6.7 percent change of reoffending. She also noted that even people who have never offended carry some risk that they will offend in the future. In her opinion, it is not likely that appellant would reoffend if released.

Howard Barbaree, another psychologist, has extensively studied sex offenders and sexual deviancy, and has published on the issue of recidivism risks. He said testosterone replacement therapy is common for men who, like appellant, have suffered prostate cancer. According to Barbaree, a male's magnitude of sexual arousal begins to decline at 13 years old. He conducted a study of individuals who received sex offender treatment in prison and concluded reoffense rates for older inmates declined steadily from the rates of released younger offenders. He said studies show the decline in sexual activity is more attributable to age than testosterone levels.

Richard Romanoff is a psychologist on the State's SVP panel. He initially evaluated appellant in 2002 and found him to qualify as an SVP. He changed his mind with his 2005 evaluation. He did so primarily because of appellant's age, which he said research showed is the most significant variable.

Appellant's social workers also testified on his behalf. One said appellant does not usually yell or swear and that his outbursts are mild compared to other things that happen in a hospital setting. Another attempted to help appellant with his hearing problem that makes it difficult for him to hear in a group setting. A supervisor ordered

13

the social worker to stop because appellant should "tough it out in a group setting" and an exception should not be made for him. Additionally, a behavior specialist testified to appellant's favorable participation in her "Values in Action" class.

Appellant's sister-in-law testified that she and her husband, appellant's brother, intend to have appellant live with them in New York if released. She said they are committed to assuring that appellant sees a therapist.

## II

## DISCUSSION

Under the Sexually Violent Predator Act (SVPA), an individual who has been convicted of a sexually violent offense against one or more victims and who has a mental disorder that makes it likely he will engage in further sexually violent criminal behavior, may be committed indefinitely to the DSH. (§ 6600.) An individual committed indefinitely to the DSH as an SVP is entitled to yearly evaluations. (§ 6605, former subd. (a), as amended (Prop. 83 approved by the voters, Gen. Elec. (Nov. 7, 2006)); repealed by Stats. 2013, ch. 182, § 2, eff. Jan. 1, 2014.) Under former subdivision (a) of section 6605, the yearly report was required to consider whether the individual "currently meets" the definition of an SVP "and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person." The yearly evaluations are a way of assuring an individual's continued confinement does not violate due process. (See *Foucha v. Louisiana* (1992) 504 U.S. 71, 77, 86 [confinement of mentally ill who are not dangerous violates due process].)

In 2010, appellant received a favorable annual examination that concluded he "'no longer remains a danger to the health and safety of others in that he is not likely to engage in sexually violent predatory criminal behavior in the future' and that '[t]he bests interest of [appellant] and adequate protection for the community can be adequately addressed in a less restrictive treatment setting at this time.'" (*Landau I*, *supra*, 199 Cal.App.4th at p. 35.) At appellant's trial on his petition, the district attorney was

14

required to "prove beyond a reasonable doubt that [appellant's] diagnosed mental disorder remains such that he . . . is a danger to the health and safety of others and is likely to engage in sexually violent behavior if discharged."  (§ 6605, subd. (a)(3).)

A.  *Equal Protection*

Appellant contends he was denied equal protection of the law when the trial court required him to testify as a witness for the district attorney.  The Attorney General argues the issue was not preserved because the issue was not raised below.  Anticipating that response, appellant's opening brief asserts that if the issue was not preserved, then he received ineffective assistance from counsel.  His contention that counsel could have no tactical reason for failing to object on equal protection grounds has merit.  Appellant's counsel clearly attempted to prevent the district attorney from calling appellant as a witness, but she failed to object on equal protection grounds.  Notwithstanding counsel's failure to raise the equal protection issue below, we will address the equal protection issue to foreclose an ineffective assistance of counsel claim.  (*People v. Curlee* (2015) 237 Cal.App.4th 709, 715-716.)

When an individual is found not guilty by reason of insanity and committed to the DSH, the person (NGI) may be confined for up to the maximum period of time he or she could have been sentenced had he or she been found guilty of the crime and sane. (Pen. Code, § 1026.5, subd. (a)(1).)  Penal Code 1026.5, subdivision (b)(1) sets forth a procedure for extending the that commitment period if the NGI, "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." When a prosecutor seeks to extend the NGI's commitment, the NGI is "entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." (Pen. Code, § 1026.5, subd. (b)(7).)  Among the constitutional rights possessed by criminal defendants is the absolute right not to be called to testify.  (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15; Evid. Code, § 930; *People v. Haynie* (2004) 116

15

Cal.App.4th 1224, 1228.) Because Penal Code section 1026.5, subdivision (b)(7) gives prospective NGI extension committees the same (constitutional) rights as criminal defendants, an NGI has an absolute right not to be called as a witness against himself at trial. (*Hudec v. Superior Court* (2015) 60 Cal.4th 815, 826; *People v. Haynie*, *supra*, 116 Cal.App.4th at p. 1230.) The *Haynie* court further stated that when the prosecutor calls an NGI to the witness stand, "the state is essentially saying that his or her testimony is necessary for the state to prove its case" and that in such circumstances, the individual is prejudiced. (*Ibid.*)

While Penal Code section 1026.5 provides its protection to NGIs, there is no similar right set forth in the provisions of the SVPA (§ 6600, et. seq.). Appellant contends the failure of the SVPA to provide the same protection to SVPs does not mean that he does not have the same rights. He argues he is entitled to the same rights under equal protection because he was similarly situated with NGIs for purposes of the law providing them with the same constitutional rights provided criminal defendants in trial.

"'"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged."' [Citation.]" (*People v. McKee* (2010) 47 Cal.4th 1172, 1202.)

The issue raised by appellant was also raised in *People v. Curlee*, *supra*, 237 Cal.App.4th 709. There the court reviewed the decision in *People v. McKee*, *supra*, 47 Cal.4th 1172, where our Supreme Court found SVPs and NGIs "were similarly situated for equal protection purposes" in connection with the terms of their respective periods of civil commitments. (*People v. Curlee*, *supra*, 237 Cal.App.4th at p. 713.) As the *Curlee* court stated, when the issue is whether SVPs are entitled to the same procedural protection granted NGIs, the initial question is whether the two groups are

16

similarly situated for purposes of that issue. (*Id*. at p. 720.) The court concluded they are (*ibid*.) and we agree.

That does not resolve the equal protection issue. The next step is to determine whether the state has demonstrated a sufficient reason for treating NGIs and SVPs differently in trial proceedings to determine whether each has a mental disorder that makes them dangerous. (See *People v. Curlee*, *supra*, 237 Cal.Appl.4th at pp. 720-721.)

The Attorney General argues that even if there was an equal protection violation, the error was harmless because appellant's testimony was cumulative to other evidence introduced through other witnesses. We disagree. "As noted in *Haynie*, however, '[b]y calling the person in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case. We have no doubt that a committee so compelled to testify is prejudiced under these circumstances. The California Supreme Court noted in *Cramer v. Tyars* (1979) 23 Cal.3d 131 that permitting the jury to observe the person sought to be committed and to hear him speak and respond provided "the most reliable proof and probative indicator of the person's present mental condition." [Citation.] As such, we cannot conclude that compelling [the committee] to testify, even if his testimony was in some regards cumulative to that of other witnesses, was harmless error.' [Citation.]" (*People v. Curlee*, *supra*, 237 Cal.App. 4th at p. 722.)

Because we find appellant is similarly situated with NGIs for purposes of the trial procedure used to determine whether each is to be civilly confined, and the district attorney did not have the opportunity below to justify the disparate treatment of SVPs at trial, we would ordinarily remand this matter to the superior court for a hearing on the issue. However, as we will reverse the judgment in this matter based on evidentiary error, appellant may raise the equal protection argument on remand. Should the district attorney again seek to call appellant to the witness stand in this matter, the superior court is to conduct a hearing to determine whether the district attorney can,

17

subject to the applicable equal protection standard, establish sufficient justification for treating SVPs and NGIs differently for purposes of providing one a right to refuse to testify at trial while denying the same right to the other.

B. *Hearsay & Confrontation Claims*

The district attorney relied mainly on the testimony of Dietz in this matter to prove appellant had a mental disorder that makes him likely to commit sexually violent offenses if released. Appellant contends the trial court prejudicially erred in admitting a "massive amount of inadmissible hearsay" during Dietz's testimony. He cites 13 instances in which he claims the court erred in admitting inadmissible hearsay evidence. According to appellant, the admission of the inadmissible hearsay evidence not only violated the Evidence Code and prejudiced him, the rulings also denied him his due process right to confrontation.

The Attorney General argues that appellant forfeited the hearsay issue by not objecting to a number of the complained of statements. We disagree. Even if there were instances when appellant failed to object, it is clear any such objection would have been overruled. The court overruled appellant's objections specifically citing *People v. Dean* (2009) 174 Cal.App.4th 186 (*Dean*) and *People v. Campos* (1995) 32 Cal.App.4th 304 (*Campos*), in connection with Dietz's testimony.

1. *Hearsay*

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay evidence is inadmissible "except as provided by law." (Evid. Code, § 1200, subd. (b).) Multiple levels of hearsay are admissible if each level of hearsay "meets the requirements of an exception to the hearsay rule." (Evid. Code, § 1201.)

"[A] trial court's decision to admit or exclude a hearsay statement . . . will not be disturbed on appeal absent a showing of abuse of discretion. [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 956.) As a general rule, the erroneous admission of hearsay evidence will not result in a reversal unless it is reasonably probable the defendant would have received a more favorable result had the evidence not been admitted. (*Ibid.*, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The complained of evidence in this matter was admitted during the direct testimony of the People's expert, Dietz. Generally, an expert may rely on inadmissible hearsay to support his or her opinion if reliance on such hearsay is reasonable for that purpose. (Evid. Code, § 801; *People v. Catlin* (2001) 26 Cal.4th 81, 137.) Although an expert may, on direct examination, tell the jury the reasons for his or her opinions, our Supreme Court has recognized that "'prejudice may arise if, "'under the guise of reasons,'" the expert's detailed explanation "'[brings] before the jury incompetent hearsay evidence.'"' [Citations.] In this context, the court may "'exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.'" [Citation.]" (*Ibid.*) While recognizing that a testifying physician may rely on the opinion of another physician in reaching his or her opinion, the court specifically noted "it is generally *not* appropriate for the testifying expert to recount the details of the other physician's report or expression of opinion. [Citations.]" (*Ibid.*, italics added.) Appellant cites 13 instances in which he contends the court admitted inadmissible hearsay in Dietz's testimony. We address each one in turn.

Citing to two pages in the reporter's transcript, appellant argues Dietz testified to certain statements he made. He acknowledges that some of the statements appear to have been made to Dietz and were admissible, but he argues statements made to others were inadmissible hearsay. It appears appellant objects to Dietz's testimony that appellant spoke of his feelings of loneliness and the desire for company. It is not evident whether this statement was made to Dietz or someone else. That being the case, and

19

given the statement would be admissible as a party admission if the statement had been made by appellant to Dietz and offered for the truth of the matter asserted, we cannot say the court erred in admitting this evidence. (See Evid. Code, § 1220.)

Dietz also testified to a statement purportedly made by appellant to French. Appellant allegedly told French that he (appellant) thinks he is genetically predisposed to be attracted to boys, however, the statement does not appear to have been offered for the truth of the matter asserted, which means the statement was not hearsay. Even if the statement was inadmissible hearsay, any error in admitting the evidence was harmless as its purpose was to support Dietz's conclusion that appellant is a pedophile. An expert of appellant's agreed appellant is a pedophile. That being the case, appellant was not prejudiced by Dietz testifying to the alleged statement.

Next, appellant complains that Dietz testified to hearsay statements appellant made to a probation officer in 1982. Appellant admits the statements would have been admissible had the probation officer testified, but claims the evidence was inadmissible multiple hearsay because the statement was admitted through Dietz's testimony instead of the probation officer. In 1982, appellant told the probation officer that he had no sexual contact with children other than the victim in that case, David, and that the photographs found in that matter had been taken by Sid. This was not offered for the truth of the matter asserted. In fact, when Dietz testified to the statement, he added that it is known that appellant molested eight boys, not one.

Dietz also testified to statements a Ms. Annie Swindell made to police in 1987. According to the police report, Swindell, an employee of appellant's at the time, said appellant's house contained "magazines depicting children, mostly young boys, engaged in sexual acts. She and her boyfriend found it odd that every page depicting young blond-haired boys was dog-eared." Were we to assume this evidence was offered for its truth, it was hearsay (Evid. Code, § 1200, subd. (a)) and, unless otherwise provided, was inadmissible (Evid. Code, § 1200, subd. (b)). If hearsay, appellant would

20

also be correct that the testimony consisted of multiple levels of hearsay.  (Evid. Code, § 1201.)  The Attorney General argues this evidence was not admitted for the truth of the matter asserted because the Supreme Court held in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), such statements are not offered for their truth, but as an aid in evaluating the expert's opinion.  (*Id*. at pp. 618-619.)

Since the decision in *Gardeley*, the United States Supreme Court has had the opportunity, albeit in the context of a Sixth Amendment confrontation challenge, to address whether out-of-court statements considered by an expert are admitted for their truth or only as a aid in evaluating the expert's opinion.  In *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221], the United States Supreme Court was called upon do decide whether a criminal defendant was denied his Sixth Amendment right to confront and cross-examine witnesses when an expert testified to the results of a laboratory test the expert did not perform.  The lead opinion stated the issue as follows:  "Specifically, does *Crawford*[2] bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify?" (*Id*. at p. ___ [132 S.Ct. at p. 2227] (lead opn. of Alito, J.), fn. added.)  The lead opinion by Justice Alito and joined by Justices Kennedy, Breyer, and Chief Justice Roberts, concluded the statement that the DNA compared to the defendant's was obtained from the victim's vaginal swab was not offered for the truth of the matter asserted, and was only offered in support of the expert's opinion.  (*Id.* at p. ___ [132 S.Ct. at pp. 2227-2228] (lead opn. of Alito, J.).)  The lead opinion stated that "[f]or more than 200 years," courts have permitted experts to express an opinion based on facts they assume, but do not know, to be true.  "It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert."  (*Id*. at p. ___ [132 S.Ct. at p. 2228] (lead opn. of Alito, J.).)

---

[2] *Crawford v. Washington* (2004) 541 U.S. 36.

21

Because Justice Thomas concurred in the disposition of the lead opinion, the court found no confrontation violation. However, on the issue of whether the evidence was admitted for the truth of the matter asserted, or only to assist in the evaluation of the expert's opinion, a majority of the court consisting of Justice Thomas and the four dissenters, found the evidence was admitted for its truth. As Justice Thomas stated, "[t]here is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing the statement for its truth." (*Williams v. Illinois*, *supra*, __ U.S. at p. __ [132 S.Ct at p. 2257] (conc. opn. of Thomas, J.).) The reason is readily apparent: "'To use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judgment about whether this information is true.' [Citation.] 'If the jury believes that the basis evidence is true, it will likely also believe that the expert's reliance is justified; inversely, if the jury doubts the accuracy or validity of the basis evidence, it will be skeptical of the expert's conclusions.' [Citation.]" (*Ibid.*; see also *Id.* at p. __ [132 S.Ct. at p. 2269] (dis. opn. of Kagan, J.).)

Justice Kagan's dissent was joined by Justices Scalia, Ginsburg, and Sotomayor. (*Id.* at p. __ [132 S.Ct. at p. 2264] (dis. opn. Kagan, J.).) The dissent noted Justice Alito's opinion carried the day for Illinois, but that "in all except its disposition, his opinion is a dissent: Five Justice specifically reject every aspect of its reasoning and every paragraph of its explication." (*Id.* at p. __ [132 S.Ct. at p. 2265] (dis. opn. of Kagan, J.).) The dissent concluded Cellmark's DNA result was offered for the truth of the matter asserted —the identity of the victim's attacker—and that the defendant was entitled to confront and cross-examine the individual who produced the test result under *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, and *Bullcoming v. New Mexico* (2011) 564 U.S. 647. (*Id.* at p. __ [132 S.Ct. at p. 2269] (dis. opn. of Kagan, J.) ["'to pretend [such evidence] is not being introduced for the truth of its contents strains

credibility'"].) Consequently, a majority of the court concluded the evidence had been offered for its truth.

Whether our Supreme Court will continue to adhere to the rule of *Gardeley* remains to be seen. The issue is presently pending before the court in *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014 (S216681). Even assuming our Supreme Court's continued acceptance of the rule in *Gardeley*, the court has stated an expert may not, under the guise of showing his or her reasons for an opinion, "'bring before the jury incompetent hearsay evidence. [Citation.]'" (*People v. Coleman* (1985) 38 Cal.3d 69, 92, disapproved on another point in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

But even if we were we to assume Swindell's statement was offered for the truth of the matter asserted and that its admission was error, any error was harmless. It appears the purpose of admitting Swindell's statement was to support Dietz's conclusion that appellant is a pedophile. As stated above, appellant's own expert witness opined appellant is a pedophile. Consequently, admission of Swindell's statement that in 1987 appellant possessed photographs of young boys could not have prejudiced appellant, who also admitted he had been attracted to prepubescent boys. Even without appellant's admission, evidence of Swindell's statement was harmless.

Next, Dietz repeated statements appellant purportedly made to French in 1996 and 2000. Dietz said that in 1996, appellant told French that his sexual involvement with children began in the matter that resulted in his 1981 conviction for molesting David; that photographs of young boys found in a 1982 search were taken by "other adults;" and appellant denied any other neighborhood boys were involved. According to Dietz, in 2000, appellant said he had been visited by his son while at Patton State Hospital in 1981 or 1982, when in reality, it was Sid, one of appellant's victims who visited.

Appellant briefly argues that to the extent Dietz was relating French's opinion, the evidence was inadmissible under *People v. Campos*, *supra*, 32 Cal.App.4th 304. We reject this argument because there is no evidence Dietz attempted to imply to the jury that French agreed with his opinion that appellant is an SVP. In *Campos*, an expert testified Campos was a mentally disordered offender (MDO). (*Id.* at p. 307; see Pen. Code, § 2960 et seq. [commitment of MDOs until severe mental disorder that was a cause of the MDO's offense or an aggravating factor is "in remission and can be kept in remission"].) The expert in *Campos* testified she relied on other medical evaluations and those confirmed her opinion. (*People v. Campos*, *supra*, 32 Cal.App.4th at p. 307.) The appellate court concluded that a testifying expert may rely on reliable hearsay in reaching his or her conclusions, including statements of the patient or a treating professional and may, on direct examination, state the reason for that opinion. (*Id.* at pp. 307-308.) In forming an opinion, an expert may rely on reports prepared by other experts. (*Id.* at p. 308.) However, an expert "may not, on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts." (*Ibid.*) The reason for this rule is lack of the opportunity to cross-examine the other experts as to the basis for their opinions. (*Ibid.*)

The present case is distinguishable from *Campos*. The evidence appellant complains was improperly admitted did not consist of French's expert opinion. Rather, it consisted of statements made to French. As the court in *People v. Miller* (2014) 231 Cal.App.4th 1301 noted, *Campos* and the case it relied upon, *Whitfield v. Roth* (1974) 10 Cal.3d 874, 894, "were concerned with preventing the introduction of multiple opinions, insulated from cross-examination, into evidence." (*People v. Miller*, *supra*, 231 Cal.App.4th at p. 1313, fn. 8.) When the testifying expert does not rely on the nontestifying expert's opinion, but only on statements made to that expert, the reasoning of *Campos* does not apply. (*Ibid.*)

24

In any event, it does not appear these statements were admitted for their truth. Contrary to appellant's alleged statement to French in 1996, that his sexual involvement with children began with his molestation of David, the record is replete with evidence that appellant's sexual involvement with children dated as far back as 1969. It was in 1969, that appellant met and then molested eight-year-old Sid. Moreover, this evidence was offered in support of Dietz's diagnosis of pedophilia, which, as we stated above, was not contested by appellant.

The statement that the photographs of young boys were taken by other adults, not appellant, and that other boys were not involved was also not admitted for its truth. This statement was likewise admitted in support of Dietz's diagnosis of pedophilia. Additionally, it is evident from Dietz's testimony that he did not consider the statement true. He characterized it as a pedophile's effort to deny his own actions. Dietz added that at one point appellant also said Sid. took the photographs.

The 2000 statement to French that appellant's son had visited him in Patton State Hospital was not admitted for its truth either. Sid visited appellant at Patton State Hospital, not appellant's son.

Appellant argues Dietz testified to statements appellant purportedly made to made to Dr. Trompetter[3] in 2000, consisted of multiple levels of inadmissible hearsay. In one of the statements, appellant said his connection with the families of various victims was the result of his desire to feel part of a family and not the result of an attempt to groom victims. This statement was not admitted for its truth. Aside from the fact that the prosecutor surely wanted the jury to conclude appellant groomed his victims and that the statement was false, Dietz testified the significance of appellant's statement was in comparing it to later admissions by appellant that the statement was not true. The court

_____

[3] The record does not contain Dr. Trompetter's first name.

25

did not err in admitting Dietz's testimony regarding this statement of appellant to Trompetter.

In the second complained of statement to Trompetter, appellant admitted he was "born attracted to children."  Again, even if this was admitted for its truth, no prejudice would have resulted from its admission because the evidence was admitted to support Dietz's conclusion that appellant is a pedophile, a diagnosis with which appellant's expert agreed.

Appellant further complains a statement he purportedly made to Dr. Arnold[4] in 2007 was inadmissible hearsay.  According to Dietz, appellant told Arnold sex was never a "primary goal" in his relationship with boys.  Again, this statement was not admitted for its truth.  Dietz said the statement was not true, as evidenced by appellant's statement to Dietz in 2008, wherein appellant admitted his ultimate goal was "always" to have sex with the boys and for that reason he "groomed them."

In discussing appellant's release plans, Dietz said appellant intended to move to New York, and live with his brother and his brother's wife.  The district attorney then asked Dietz if he found "in the record" that appellant stated a different plan.  Over appellant's hearsay objection, Dietz testified records he reviewed indicate that in 2005, appellant told the property manager for the home owned by the Landau family in Orange County, that he would like to move into that residence upon release.  Again, even assuming that evidence and Dietz's testimony that appellant told Dr. Korpi[5] in 2007 that he would like to get back into construction work if released, its admission was harmless.  The fact that in 2005 (or 2008), appellant said he wanted to return to Orange County, but by 2013 had changed his mind and wanted to move back to New York, or that at one time he intended to go back into construction work could not have prejudiced appellant's case.

---

[4] The record does not contain Dr. Arnold's first name.

[5] The record does not contain Dr. Korpi's first name.

26

Appellant also challenges the court's ruling permitting Dietz to testify to statements appellant purportedly made to Trompetter in 2000, According to Dietz, appellant told Trompetter that he did not see himself as a risk to reoffend if only because of the negative sanctions it subjected him to in the past. Whether this evidence was properly admitted or not, any error in admitting the evidence would have been harmless. Dietz testified to a similar statement made to him by appellant in 2008.

Over appellant's objection, Dietz was permitted to testify to a statement appellant purportedly made to Dr. Alumbaugh.[6] Dietz said, "In [Alumbaugh's] deposition in March of 2012, Dr. Alumbaugh testified that Mr. Landau was masturbating at night in his room at varying frequency. She testified, quote, 'sometimes once a month, sometimes up to twice a week,' end quote." These statements were admitted in violation of *People v. Campos*, *supra*, 32 Cal.App.4th 304, however, given the fact that Dietz asked appellant about these statements and appellant admitted the return of his sex drive, any error in admitting this testimony was harmless.

Admission of evidence purportedly obtained from hospital records not admitted into evidence pursuant to Evidence Code sections 1271 or 1280,[7] is a different matter. Appellant complains about Dietz's testimony concerning appellant's conduct in the state hospital, conduct Dietz did not see and presumably read about in appellant's chart at the hospital. Appellant argues this evidence was inadmissible under *People v. Dean*, *supra*, 174 Cal.App.4th 186.

*People v. Dean*, *supra*, 174 Cal.App.5th 186, involved an SVP trial. During the trial, the People's experts testified to details in the defendant's records at

_____

[6] The record does not contain Dr. Alumbaugh's first name.

[7] Hospital records, if properly authenticated, are admissible under the business records exception to the hearsay rule. Authentication requires the entries to have been made in the regular course of business, at or near the event and the method and time of preparation tend to indicate the entry's trustworthiness. (*People v. Dean*, *supra*, 174 Cal.App.4th at p. 197, fn. 5.)

27

Atascadero State Hospital "and other institutional records." (*Id.* at p. 197.) Aware of the holding in *People v. Catlin*, *supra*, 26 Cal.4th at page 137, that an expert's testimony which brings before the jury incompetent hearsay evidence may result in prejudice to the jury (*People v. Dean*, *supra*, 174 Cal.App.4th at p. 197), the *Dean* court found the experts testified to records involving "other acts of misconduct, of which there was no competent evidence." (*Id.* at p. 199.) One of the experts, a Dr. Starr, improperly testified to the specifics of records at the state hospital. (*Id.* at p. 200.) She said the records showed a "drug dog" was brought into the hospital and immediately "hit on" the defendant, he went to the library once without permission, on another occasion he wrote a derogatory term for a woman on a dry erase board, and the doctor testified to a number of matters she apparently read in the defendant's juvenile records. (*Ibid.*)

The appellate court found the testimony was "highly inflammatory and, without foundational testimony concerning the records, is of questionable reliability. The value of this testimony to support the bases of Dr. Starr's opinions is simply outweighed by the risk that the jury will impermissibly use the information. In short, under the guise of supporting her opinion, such testimony improperly brought before the jury incompetent hearsay evidence. The trial court abused its discretion in allowing such detailed testimony from documents not otherwise admissible into evidence." (*People v. Dean*, *supra*, 174 Cal.App.4th at pp. 200-201, fn. omitted.) In a footnote, the court concluded that other than facts testified to and taken from records of the state hospital and other institutions, "there was nothing to support the reliability of reports of particular events." (*Id.* at pp. 200-201, fn. 8.)

The *Dean* court found the evidence was improperly admitted, but the error was harmless because the trial court had instructed the jury prior to Dr. Starr's testimony that it should not consider statements testified to by the doctor for their truth, and again instructed the jury after the doctor's testimony. (*People v. Dean*, *supra*, 174 Cal.App.4th at pp. 201-202.) Additionally, the court noted the majority of the information the experts

28

testified to from institutional records were also testified to by the defendant. (*Id*. at p. 202.)

Dietz said records at Coalinga State Hospital showed appellant's testosterone level was tested on May 23, 2013, and determined to be 974. According to Dietz, the testosterone level is important because it is the major driver of sexual interest and there is a relationship between testosterone levels and the risk of reoffending untreated pedophiles. Dietz said the lab report stated the normal range for testosterone among males over 50 years old is 212 to 755. Over appellant's objection, Dietz testified to the contents of Ashby's notes at the hospital. According to the June 21, 2013 notes, appellant's testosterone level was 894 at the time. The court erred in admitting this evidence (*People v. Dean*, *supra*, 174 Cal.App.4th at pp. 199-200), but the error was harmless. Ashby, appellant's primary physician, also testified to appellant's elevated testosterone level. That the testosterone level was also testified to by Dietz did not prejudice appellant.

Dietz said records from the Coalinga State Hospital contained a diagnosis of appellant with Dysthymic disorder, a form of minor depression. The court erred in admitting this inadmissible hearsay evidence as well. In *People v. Campos*, *supra*, 32 Cal.App.4th 304, Dr. Mertz testified at the defendant's mentally disordered offender commitment trial. She diagnosed the defendant with "'organic mental disorder,'" and that she considered reports from the Department of Corrections and Department of Mental Health and the evaluations confirmed her opinion that the defendant qualified as an MDO. (*Id*. at p. 307.) The defendant contended the conclusions of nontestifying experts were inadmissible hearsay. (*Ibid.*) The *Campos* court stated an expert witness may state the reasons for her opinion, but "may not, on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts." (*Id*. at p. 308.) The reports of nontestifying experts are hearsay. (*Ibid*.) An expert's testimony is

not to be used as a means of introducing the opinion of other, nontestifying experts. (*Ibid.*)

Although the court erred in admitting evidence of the diagnosis of Dysthenic disorder purportedly contained in records at the state hospital, any error would have been harmless. It appears the purpose of introducing this evidence was to explain why appellant had been given SSRI medications, which have a side effect of reducing a male's testosterone level. This evidence did not prejudice appellant. The fact that appellant's testosterone levels were reduced while he was on SSRI medications was not a fact that could cause the jury to find appellant remains a danger to society if released from the state hospital. Indeed, just the opposite. It is the fact that having insisted on testosterone treatment, appellant's testosterone level far surpassed what one would expect to find in a man of his age, that could cause concern over his release, given the major driver of sexual interest is testosterone. Moreover, the diagnosis of Dysthymic disorder was also testified to by appellant's own expert.

Appellant contends Dietz's testimony that he had talked with individuals other than appellant who stated the use of SSRIs "dampen[ed] their sex drive," and was aware of a study of 192 women and 152 men who had been prescribed SSRIs was improper. Dietz said 58 percent of the individuals reported sexual dysfunction while taking the medications. Even were we to find this evidence consisted of inadmissible hearsay (*People v. Dean*, *supra,* 174 Cal.App.4th at pp. 200-201; *People v. Campos*, *supra*, 32 Cal.App.4th at p. 307), the error would be harmless for the same reason permitting Dietz to testify that appellant received SSRI medication was harmless. Moreover, appellant's expert, Barbaree, also testified to the content of the study.

Dietz testified a police report in the 1980s indicated the mother of one of appellant's victims, Frankie B. (Frankie), related that she thought appellant had been "pushy" when he asked her why her son was not allowed to go his house and why she would not buy her son a pair of shorts. This was multiple hearsay. It does not appear in

30

the record that appellant had been convicted of molesting Frankie. Therefore, this evidence was not admitted pursuant to section 6600, subdivision (a)(3).[8] The court erred in admitting this hearsay evidence.

Dietz was permitted to testify to the content of a study conducted in 2005, that looked to see if there was a relationship between testosterone and recidivism risk in sex offenders. Dietz testified the study found "a significant correlation between testosterone level and reoffending" and the results of the study were consistent with his opinion. Although Dietz could testify to his own opinions, he could not testify to the opinions of other experts. Admission of this evidence was error. An expert may not, on direct examination, testify to the contents of reports prepared by or the opinions of other experts. (*People v. Campos*, *supra*, 32 Cal.App.4th at p. 308.)

Dietz also testified about appellant's Asperger's diagnosis. He said a symptom of Asperger's is restrictive repetitive and stereotyped patterns of behavior, including inflexible adherence to nonfunctional routines or rituals. As an example of such behavior, Dietz cited appellant's religious-like walking of the halls at Coalinga State Hospital for many miles a day. Dietz found the references to appellant's walking in his medical records at the hospital. The court overruled appellant's hearsay objection made pursuant to *People v. Dean*, *supra*, 174 Cal.App.4th 186.

Dietz also discussed appellant's obsessive-compulsive behavior referred to in hospital records. According to Dietz, appellant hoarded food and newspaper clipping, and nursing notes were "quite clear" that appellant is "very precise about how things are hanged there in his room." Dietz said medical record notes from August 9, 2009 stated

---

[8] "The existence of any prior convictions may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals." (§ 6600, subd. (a)(3).)

31

appellant was "obsessive-compulsive about [his] room as evidenced by [his] meticulous arrangement of articles," and about clipping loose threads on his clothing, and his precise measurements between pictures.

In discussing the purpose of group therapy, the district attorney asked Dietz if the record demonstrated appellant had an oppositional attitude toward the sex offender therapy program. Over appellant's objection, Dietz testified appellant did not think much of the program offered at Patton State Hospital when appellant was there in 1982. It is not clear whether what appellant thought of the program was contained in records at the hospital or whether Dietz obtained appellant's view during an interview with appellant. However, Dietz did testify he reviewed records from the Coalinga State Hospital stating what programs had been offered to appellant and that staff members had encouraged appellant to participate and informed him "which groups and treatment programs [staff] thought he needed in order to be prepare[d] to be discharged," and that appellant stated an intent not to undergo treatment.

Dietz added that records indicate appellant has behaved "in a pretty nasty way towards staff members and sometimes other patients." Again over appellant's objection, Dietz said he reviewed Coalinga State Hospital records and according to an entry on April 10, 2009, a staff member documented a physical altercation between appellant and another patient over a menu. He also testified to the content of a July 2009 entry wherein appellant used obscene language and a racial slur in describing a patient, and a November 2009 entry wherein appellant called a female patient a "bitch." Dietz then proceeded to tell the jury of the contents of 12 other entries in appellant's chart, including repeated instances of appellant yelling and swearing at staff, refusing to let staff inspect his outgoing mail, pulling down his pants and "mooning" a member of the hospital staff, telling staff that he is a mental patient and is not required to follow "f . . . g rules," calling female staff member a "fat bitch," refusing to follow regulations or complying with staff requests, and telling a social worker she was nothing but a "piece of

32

shit." Based on the events described therein, Dietz concluded appellant continues to have interpersonal difficulties maintaining healthy relationships.

Again over objection, Dietz was permitted to testify to the content of a 2013 annual review setting forth the barriers DSH staff perceived to appellant's release. Dietz referenced a note made on May 10, 2010. The note purportedly documented appellant's statement that he would stop taking testosterone injections in a few months if he saw no notable benefit to the injections. Dietz said the record showed appellant did not stop taking the injections. Instead, appellant insisted on receiving timely injections. Dietz said such injections were dangerous and the opposite of what should be done with sex offenders. He added that records documented a comment by appellant to the effect that his sex drive had returned.

Dietz's testimony concerning what he purportedly saw in appellant's state hospital records was improperly admitted. (*People v. Dean*, *supra*, 174 Cal.App.4th at pp. 199-200.) As noted above, it does not appear the records themselves were admitted into evidence. Section 1271 of the Evidence Code provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." These requirements provide some assurance as to the reliability of the records. Dietz was apparently in no position to testify to the foundation necessary to admit such records into evidence. Without testimony as to the manner in which the records were prepared, the statements purportedly contained therein cannot be said to have been shown to be reliable. Thus, the court should have excluded Dietz's repeated reference to the content of the records.

33

Admission of this evidence and the other inadmissible hearsay evidence was prejudicial. Convincing a jury that one who has previously been found to be an SVP is ready to be released back into society is no easy task even in the best of cases for an SVP. The inadmissible evidence admitted in this matter cast appellant in a most unfavorable light as someone who will not follow rules, demonstrates no concern for others, and engages in some form of violence. That made the task impossible, regardless of the properly admitted evidence. The "facts" Dietz testified to may well be true, but introducing chart entries through Dietz was improper and violated the hearsay rule. (*People v. Dean*, *supra*, 174 Cal.App.4th at p. 199.) Admission of this evidence, evidence that had no basis for concluding the evidence was reliable, was prejudicial and requires reversal of the judgment.

In conclusion, most of appellant's hearsay arguments lack merit. Either the challenged statements were not offered for their truth or were harmless error if they were admitted for their truth. However, a number of his hearsay contentions with regard to Dietz's testimony have merit: that appellant was "pushy" with the mother of one of his victims; testifying to the content of the 2005 study on testosterone's impact on recidivism rates of sex offenders; testifying to the content of hospital records to back up Dietz's conclusion that appellant is obsessive compulsive; testifying to records stating the staff thought appellant should take part in treatment and appellant refused; and testifying to hospital notes purportedly documenting the numerous "nasty" ways in which appellant treats people (staff and patients) at the hospital. Admission of this hearsay evidence prejudiced appellant. In other words, there is a reasonable chance a jury that did not hear this prejudicial evidence would have reached a more favorable result for appellant. (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.)

2. *Confrontation*

As noted above, appellant also maintains his right of confrontation under due process was violated by the court's rulings admitting the above hearsay through

34

Dietz.  The state and federal confrontation clauses only apply in criminal trials (*Crawford v. Washington* (2004) 541 U.S. 36, 42; *People v. Otto* (2001) 26 Cal.4th 200, 214), but there is a confrontation component to a civil litigant's right to due process. (*Ibid.*)  As a civil committee, appellant was entitled to due process in his trial.  (*Foucha v. Louisiana*, *supra*, 504 U.S. at p. 80; *People v. Otto*, *supra*, 26 Cal.4th at p. 209.)  Because we found admission of inadmissible hearsay prejudiced appellant and requires reversal, there is no need to determine whether admission of the same evidence also violated appellant's confrontation right under due process.

## C.  *Conditional Release/Ineffective Assistance of Counsel*

Appellant argues the trial court erred in refusing to permit him to introduce evidence and to argue to the jury that if it found he should not be unconditionally released from the hospital, it must determine whether he should be conditionally released.  We address this issue to provide guidance to the trial court on remand.

Under the statutory scheme and case law in place at the time of appellant's commitment to the DSH and through his trial on his petition, when a court holds a probable cause hearing on an SVP committee's petition after the SVP received a favorable evaluation, the court is to determine whether "probable cause exists to believe that the committed person's diagnosed mental disorder has so changed that he or she is not . . . likely to engage in sexually violent criminal behavior if discharged, then the court shall set a hearing on the issue."  (§ 6605, former subd. (c), as amended (Prop. 83 approved by voters, Gen. Elec. (Nov. 7, 2006)); repealed by Stats. 2013, ch. 182, § 2, eff. Jan. 1, 2014; *People v. Smith* (2013) 212 CalApp.4th 1394, *Landau I*, *supra*, 199 Cal.App.4th 31.)  Although former subdivision (a) of section 6605 referred to an annual evaluation to determine whether the individual continues to meet the definition of an SVP "and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would

35

adequately protect the community," and former subdivision (b) referred to authorization from the DSH to file a petition if the individual best interest is to be conditionally released, the remaining subdivisions of section 6605—provisions that prescribe the manner of proceeding on a petition filed by the individual—made no reference to conditional release. (*People v. Smith*, *supra*, 212 Cal.App.4th at pp. 1400-1404.)

This created a problem because prior to the passage of Proposition 83, section 6608 appeared to be the exclusive statutory means of petitioning for a conditional release. The amendments made by the proposition to section 6605 authorized a petition to be filed by the committed individual if he received a favorable evaluation indicating he either no longer meets the definition of an SVP or that a conditional release is in his best interest and the DSH agrees. (But see *Landau I*, *supra*, 199 Cal.App.4th at p. 39 [director of hospital should have authorized Landau to file petition under section 6605 when the director received the favorable evaluation].) While a trial pursuant to section 6605 required the district attorney to prove beyond a reasonable doubt the appellant still meets the definition of an SVP and is likely to reoffend if released (§ 6605), under section 6608, an individual committed as an SVP and who has petitioned for a conditional release was not entitled to a jury trial and was required to prove by a preponderance of the evidence his entitlement to relief. (*People v. Smith*, *supra*, 212 Cal.App.4th at pp. 1399-1400.) The *Smith* court resolved this ambiguity by holding a favorable report recommending a conditional release should proceed via the procedure set forth in former section 6605, i.e., a probable cause hearing and a jury trial if probable cause is found and a party demands a jury trial. (*People v. Smith*, *supra*, 212 Cal.App.4th at p. 1404.)

Appellant claims his petition for an unconditional release subsumed within it a request for a conditional release, and that the trial court erred in refusing to permit the issue of a conditional release to be presented to the jury. The court held the district attorney was entitled to a probable cause hearing on the issue of whether defendant could be conditionally released for treatment in a less restrictive setting and denied appellant

36

the opportunity to present the issue of a conditional release to the jury. We find the trial court abused its discretion and prejudicially erred.

Appellant's petition included the annual evaluation and a declaration from the evaluator. The declaration stated appellant was "no longer" an SVP because he was unlikely to engage in sexually violent acts and that "adequate protection for the community can be adequately addressed in a *less restrictive treatment setting* at this time." (Italics added.) The yearly evaluation attached to the petition confirmed the diagnoses of pedophilia and Asperger's disorder, but concluded appellant "no longer remains a danger to the health and safety of others in that he is not likely to engage in sexually violent predatory criminal behavior in the future. The best interest of Mr. Landau and adequate protection for the community can be adequately addressed in a *less restrictive treatment setting* at this time." (Italics added.)

On April 5, 2012, a probable cause hearing was held at our direction, Judge W. Michael Hayes presiding. (*Landau I*, *supra*, 199 Cal.App.4th at p. 41.) At the probable cause hearing, the same deputy district attorney who would eventually try this matter argued to the court that appellant's petition asked for an unconditional release *and a conditional release*. "And Mr. Landau has petitioned for both. His petition is for both. I mean he naturally wants the greater. He wants unconditional release. But he's put in his request for the lesser as well." At the conclusion of the hearing, the court found appellant was entitled to a trial on his petition. An SVP seeking review of his status is entitled to a trial on his petition if a court finds "that probable cause exists to believe that the committed person's diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged." (§ 6605, former subd. (c), as amended (Prop. 83 approved by voters, Gen. Elec. (Nov. 7, 2006)); repealed by Stats. 2013, ch. 182, § 2, eff. Jan. 1, 2014.)

37

Appellant's trial was scheduled to begin on October 29, 2013. Jury selection did not begin until two days later. In the interim, the court addressed a number of preliminary matters, including in limine motions. One such matter was whether appellant would be permitted to have the jury decide whether he should be granted a conditional release. Appellant's brief on the issue stated "[t]here is precious little guidance" on how to conduct a trial on an SVP's petition and noted the then recent case of *People v. Smith*, *supra*, 212 Cal.App.4th 1394, appeared to be the only case to address the issue: "Subdivision (c) [of Section 6605] must simply be deemed to read: 'If the court at the show cause hearing determines that probable cause exists to believe that the committed person's diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged *or if confined in a state-operated forensic conditional release facility . . . .*' [Citation.] This italicized clause must also be read into the fifth sentence of subdivision (d), following the words 'if discharged,' and the clause '*or confined in a state-operated forensic conditional release facility*' deemed added to the end of subdivision (e)." (*People v. Smith*, *supra*, 212 Cal.App.4th at p. 1404.)

Contrary to his assertion at the probable cause hearing, on October 30, 2013, the district attorney told the trial court appellant's petition sought only an unconditional release. The district attorney's brief conceded appellant was entitled to a trial on his petition and that the People then bore the burden of proving beyond a reasonable doubt appellant still qualifies as an SVP, but argued only the issue of an unconditional release was to be decided at trial. The district attorney based his argument on the theory that permitting appellant to present evidence that he could be conditionally released would deny the People due process.

Appellant's counsel then filed an amended petition. Although the district attorney opposed the amendment, he noted that trial on the issue of a conditional release could be bifurcated and then tried after the trial on the issue of an unconditional release

38

should appellant lose that issue. The court struck the amended petition and held the jury would not be presented with evidence regarding conditional release. The prosecution had argued its right to due process would be violated if the issue of conditional release were to be submitted to the jury because the court did not conduct a probable cause hearing to determine whether he should be *conditionally* released.

Permitting the jury to consider whether appellant should be conditionally released would not prejudice the People. At least as of the time of the probable cause hearing the district attorney knew appellant sought an unconditional release, but that in the event he failed on that issue, he still wanted at least a conditional release. Moreover, if a petition alleges the SVP committee is no longer a danger to the public, it subsumes the position that he no longer needs to be confined in a state mental hospital and would not be a danger if conditionally released and supervised, i.e., at a minimum the individual no longer needs to be confined in a state hospital. The People no more suffer prejudice in this situation that a criminal defendant who goes through a preliminary hearing on a felony complaint charging murder, but whose jury is subsequently instructed and convicts the defendant of manslaughter as a lesser offense. In such a case, the charging document generally alleges the defendant committed an unlawful killing with malice aforethought, but manslaughter does not require malice (*People v. Bryant* (2013) 56 Cal.4th 959, 969).

An SVP committee is entitled to unconditional release if it is not proven beyond a reasonable doubt the committee continues to meet the definition of an SVP (one who has committed the qualifying crime(s) and has a mental disorder that makes it likely he will engage in sexually violent conduct if released). (*People v. Curlee*, *supra*, 237 Cal.App.4th at p. 712; §§ 6600, subd. (a)(1), 6604.) And an SVP committee is entitled to conditional release if he not likely to engage in sexually violent criminal behavior due to a mental disorder, "'if under supervision and treatment in the community.' (§ 6608, subd. (g).)" (*People v. Johnson* (2015) 235 Cal.App.4th 80, 84.)

We find appellant should have been permitted to have the jury decide whether he should be conditionally released if the jury concluded he did not qualify for an unconditional release. This should no more be an all-or-nothing proceeding than a criminal matter. (*People v. Breverman* (1998) 19 Cal.4th 142, 155 [instruction on lesser included offenses prevents either side from presenting to the jury and "'unwarranted all-or-nothing choice,'" encourages a just verdict based on the evidence, and protects the interest of both parties and "'the jury's truth-ascertainment function'"].) The error was prejudicial. Introduction of evidence regarding conditions that could be placed on appellant's release and the supervision that would be in place should he be conditionally released may very well have caused the jury to consider and grant such a release. If there is probable cause to believe an SVP would not be a threat to the public if unconditionally released, as was found in the present case, there is probable cause to believe the individual would not pose a threat to the public if he is *conditionally* released with supervision.

D. *Other Issues*

Appellant argues the deputy district attorney committed prejudicial misconduct by arguing character evidence to convince the jury appellant is an SVP. We need not decide this issue given our disposition in this matter. Neither need we address the issue of whether the court erred in answering a question from the jury.

## III

## DISPOSITION

The judgment is reversed and the matter is remanded to the superior court for proceedings not inconsistent with this opinion.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.