Filed 5/17/17 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B264885 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. ZM011271) |
| v. | |
| NICKOLAS ROA, | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed herein on May 2, 2017, be modified as follows:

1. On page 20, the first full paragraph under the heading *A. Scope of permissible expert testimony*, is modified to read as follows:

> As discussed, the existence of a qualifying SVP conviction and the details underlying the offense can be established by multiple-level hearsay evidence such as preliminary hearing and trial transcripts, probation and sentencing reports, and evaluations by the California Department of State Hospitals. (§ 6600, subd. (a)(3); *Otto, supra*, 26 Cal.4th at p. 208.)  Because the facts underlying the qualifying offenses were presented to the jury pursuant to a

hearsay exception under section 6600, subdivision (a)(3), the experts could permissibly relate those facts to the jury as the basis for their opinions. (*Burroughs, supra,* 6 Cal.App.5th at p. 403.) The experts could also testify that the defendant was convicted of a qualifying offense, as evidence of such a conviction was admitted into evidence under Penal Code section 969b. (*Dean, supra*, 174 Cal.App.4th at p. 196.) Finally, experts may testify as to a defendant's likelihood of reoffending. (*People v. Therrian, supra*, 113 Cal.App.4th at p. 615.)

2.  On page 21, in the second full paragraph beginning with "In *Landau*", the citation for *People v. Landau* should be corrected to read:

(*Landau, supra*, 246 Cal.App.4th at p. 876.)

3.  The paragraph at the bottom of page 30 commencing with "Roa's trial counsel objected to exhibit 18" and ending at the top of page 31 with "the trial court's ruling" is modified to read as follows:

Roa's trial counsel objected to exhibit 18, a certified copy of the CLETS printout detailing Roa's criminal history on the grounds that it was prejudicial, cumulative of the abstract of judgment, and did not prove prior convictions. Roa's counsel raised no hearsay objection to the CLETS printout. The trial court ruled that the printout was relevant because the experts relied on it to support their diagnosis of antisocial personality disorder. Roa has demonstrated no error in the trial court's ruling.

2

4.  On page 31, the first full paragraph beginning with "As to exhibit 21" and ending with "to those documents as well," is modified to read as follows:

As to exhibit 21, the prior prison packet prepared pursuant to Penal Code section 969b, Roa's trial counsel objected to the portion containing the prison chronological history logs on the ground that they did not "show[] anything in regards to his -- the prior convictions that the People need to prove in this case." The trial court overruled the objection because the logs showed disciplinary write-ups in prison that the experts relied upon as the basis for their antisocial personality disorder diagnosis.

Trial counsel's objection to the chronological history portion of Roa's prison record was arguably sufficient to preserve an argument on appeal that such evidence was inadmissible hearsay. The chronological history portion of Roa's prison records does not come within the hearsay exceptions set forth in section 6600, subdivision (a)(3) or Penal Code section 969b. The chronological history does not show the existence of a prior qualifying SVP conviction or the details underlying commission of the offense that led to the prior qualifying SVP conviction. (§ 6600, subd. (a)(3).) Admission of that portion of Roa's prison records into evidence accordingly was error. (See *Burroughs, supra*, 6 Cal.App.5th at p. 410 [trial court erred by admitting into evidence portions of probation reports containing information about SVP committee's prior record, adult history, personal history, physical/mental/emotional health, education, employment and terms and conditions of probation].)

3

Roa failed to raise any objection in the trial court below to exhibits 12, 13, and 17 and forfeited his objections to those documents.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____
_____

ASHMANN-GERST, Acting P. J., CHAVEZ, J., GOODMAN, J.*

\* Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 5/2/17 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B264885 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. ZM011271) |
| v. | |
| NICKOLAS ROA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  James R. Dabney, Judge.  Reversed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

Nickolas Roa (Roa) appeals from the judgment and order committing him indefinitely to the custody of the Department of

State Hospitals after a jury found him to be a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.).[1]  Roa contends the trial court committed prejudicial error and denied him his due process rights by allowing the expert witnesses to testify as to case-specific facts that constitute inadmissible hearsay under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and by admitting into evidence hearsay statements contained in documents that should have been redacted or excluded in their entirety.

We conclude that the trial court erred by allowing the experts to recite case-specific facts that were not independently proven by admissible evidence and that the error was prejudicial under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818.  We therefore reverse the judgment.

## PROCEDURAL HISTORY

On February 14, 2007, the Los Angeles County District Attorney (the People) filed a petition pursuant to the SVPA to commit Roa as an SVP.[2]  The trial court reviewed the petition

_____

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     Roa was previously found to qualify as an SVP and was committed to a state hospital.  This court affirmed the previous order of commitment in a nonpublished opinion (*People v. Roa* (Mar. 9, 2000, B131389)).  Before 2006, a person determined to be an SVP was committed to the custody of the Department of Mental Health for a two-year term, which could be extended for additional two-year periods.  (Former § 6604, as amended by Stats. 2000, ch. 420, § 3; former § 6604.1, as amended by Stats. 2000, ch. 420, § 4.)  Roa's previous commitment was pursuant to the former version of the SVPA.  In 2006, the statutes were amended to provide for an indeterminate term of commitment.  (Stats. 2006, ch. 337, §§ 55, 56; Prop. 83; see *People v. Whaley* (2008) 160 Cal.App.4th 779, 785-787.)

and ordered a probable cause hearing pursuant to section 6602. A probable cause hearing was conducted on June 25, 2009, at which Dr. Jack Vognsen and Dr. Jeffrey Davis testified. At the conclusion of the hearing, the trial court found that the petition stated sufficient facts that would constitute probable cause to believe that Roa was likely to engage in SVP criminal behavior upon release. The matter proceeded to a jury trial that commenced on May 26, 2015.

As relevant here, Roa's counsel filed two motions in limine to preclude the People's experts from considering, relying upon, or discussing the contents of two reports prepared by a district attorney investigator in 1999 and to preclude the experts from testifying as to "the details or contents of hearsay statements, including those contained in police and probation reports and psychiatric and medical records, when disclosing hearsay statements that were relied upon in forming their opinions unless the statements themselves are admissible." The trial court ruled that the experts could testify regarding the "general substance" of information they gleaned from documentary evidence, including the investigator's reports, as the basis for their opinions, but that the reports and any other documents reviewed by the experts would not be admitted into evidence unless they came within a hearsay exception.

At the conclusion of the trial, the jury returned a verdict finding true the allegation that Roa was an SVP and a danger to the health and safety of others because he is likely to engage in acts of predatory sexual violence. The trial court ordered Roa committed indefinitely to Coalinga State Hospital. This appeal followed.

# BACKGROUND

**The People's evidence**

### Dr. Jack Vognsen

Jack Vognsen, a forensic psychologist who contracts with the California Department of State Hospitals (DSH) to provide SVP evaluations, testified as an expert witness. He evaluated Roa in 2004 and prepared updated evaluations in 2006, 2009, and 2013, and an addendum to the 2013 evaluation in 2014. Because Roa repeatedly refused to be interviewed, Vognsen based his evaluations on Roa's state hospital records, court records, police reports, probation officer reports, prison records, and criminal history reports prepared by the Department of Corrections and the Department of Justice. He also reviewed and relied upon the two district attorney investigator reports prepared in 1999.

### 1. Convictions for SVP offenses

Vognsen opined that Roa had been convicted of two qualifying SVP offenses. He testified as to the details of those offenses, based on his review of probation officer's reports and police reports in both cases. The first offense occurred in 1977, when Roa sexually assaulted a realtor named Helen who was conducting an open house. Roa held a knife to Helen's throat and forced her to undress and orally copulate him. He sodomized her with his fingers and bit her genitals, anus, and buttocks. Roa was convicted in 1978 of oral copulation by force for the offense against Helen and was sentenced to two years in prison.

The second qualifying offense occurred in 1984. Roa went to the home of a woman named Michelle whom he had met on a previous occasion, said his car had broken down, and asked to use the bathroom. When he was finished, Roa told Michelle he had something in his car to show her, and she went outside with him. Roa opened the car door, grabbed Michelle by the hair and forced her into the car. He told Michelle that he had a knife and drove

to an abandoned pallet yard.  There, Roa raped and orally copulated Michelle over a two-hour period.  When Michelle resisted, Roa struck her in the face.  He was convicted in 1984 for oral copulation by force, penetration of the anus with a foreign object, rape, and kidnapping.

## 2. Mental disorder

Vognsen diagnosed Roa with a paraphilic disorder[3] with nonconsenting others, sexual sadism, antisocial personality disorder, and a substance abuse disorder.

Vognsen based his sexual sadism diagnosis on the circumstances of the offense against Helen, which he said demonstrated Roa's interest in sexually humiliating the victim rather than having sexual intercourse with her.  Vognsen testified that he was not "totally comfortable" with the sexual sadism diagnosis until he reviewed a district attorney investigator's report on a 1999 interview with Roa's ex-wife, Bertha.  According to Bertha, Roa had to beat her, humiliate her, and see her cry and scream before he could become sufficiently aroused to have sexual intercourse with her.  Bertha stated that she was 17 years old and Roa was 16 when they married and that the marriage lasted between six and eight years.

Vognsen based the paraphilia diagnosis on the circumstances of the offense against Michelle, in which Roa sexually coerced the victim using force and threats.  Vognsen found further support for that diagnosis in two additional incidents he learned of after reviewing a second district attorney

_____

[3]     ""The term *paraphilia* denotes any intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature, consenting human partners." [Citation.]' [Citation.]" (*People v. Burroughs* (2016) 6 Cal.App.5th 378, 392, fn. 3, quoting Couzens & Bigelow, Cal. Law and Procedure:  Sex Crimes (The Rutter Group 2016) § 14:2, p. 14-10.)

investigator's report prepared in 1999.  Vognsen then testified as to the details of those two incidents.

The first incident was a 1967 juvenile adjudication for assault.  Roa was 17 at the time and was sent to the California Youth Authority for that offense.  Vognsen stated that Roa was attempting to rape a 12- or 13-year-old girl named Cecilia in an alley when a witness heard her cries for help and came to her aid.  Roa then fled, but was subsequently arrested and pleaded to assault.  The second incident occurred in 1974 when Roa was arrested for attempting to rape two inebriated teenage girls who were asleep in a van outside a party Roa had attended.  Roa was not convicted for that offense because the girls refused to testify.

Vognsen explained that a diagnosis of antisocial personality disorder requires evidence of a conduct disorder before the age of 15 and that he found such evidence in Roa's juvenile criminal history.  Vognsen testified that Roa's juvenile history included curfew violations, driving under the influence and without a license, and disciplinary problems in school because of fighting.  Vognsen found further support for his diagnosis in Roa's adult criminal history, which included multiple robbery offenses, assault with a deadly weapon, and theft; his prison record, which showed disciplinary sanctions for fighting; and hospital records indicating that Roa had never financially supported his children and that he had disengaged from his family, including his children and grandchildren.

Vognsen based his diagnosis of polysubstance abuse on hospital records indicating that Roa began consuming alcohol and using marijuana as a teenager and that he used other stimulants and drugs up until the time of his imprisonment, and prison records indicating that he was found in possession of inmate manufactured alcohol in 1986.

6

### 3. Likelihood of reoffending

Vognsen opined that the four principal disorders he had diagnosed -- paraphilia with nonconsenting women, sexual sadism, antisocial personality disorder, and substance abuse, interact with one another and make it more likely that Roa would reoffend in a sexually violent, predatory manner if he were to be released. Vognsen further opined that Roa lacks volitional control over his urge to humiliate women. He based this opinion on the fact that Roa raped Michelle after being arrested and convicted for the sexual assault against Helen.

Vognsen also used several diagnostic tools to assess Roa's risk of reoffending. One of these tools was the STATIC-99, an actuarial instrument that calculates a defendant's risk of reoffense based on the number of sex offenses, sentencing dates, and convictions for nonsexual violence. The STATIC-99 also takes into account the defendant's age at the time of evaluation and whether any sex offenses were against unrelated victims or strangers.

Applying the STATIC-99 factors, Vognsen testified that Roa's criminal history included long periods of custody between 1966 and 1974; previous convictions for nonsexual violence, including robbery and assault with a deadly weapon; and repeated sexual offenses against unrelated victims or strangers. He gave Roa a score of 4, indicating a moderate risk of reoffending. Vognsen stated that Roa would have qualified for a score of 5, indicating a high-moderate risk, had he been charged with a sex offense against Cecilia instead of assault.

Vognsen also assessed Roa using two other diagnostic tools -- the sexual violence risk tool[4] and the sexual recidivism SRA

_____

[4] The sexual violence risk tool considers factors such as sexual deviation, whether the defendant was a victim of child abuse, psychopathy, major mental illness, substance abuse

7

tool.[5]  Vognsen concluded that Roa presented a high risk of sexual reoffending when assessed under both of these tools.

Vognsen testified that the additional information he obtained from the district attorney investigator's reports about Roa's assault against Cecilia and the alleged abuse of Roa's ex-wife, caused him to assess Roa at a higher risk of sexual reoffending than he had previously determined in his 2013 evaluation.

### Dr. Carolyn Murphy

Carolyn Murphy, a forensic psychologist who contracted with the Department of State Hospitals from late 2006 until June 2014, testified regarding her evaluation of Roa in September 2013.  Because Roa declined to be interviewed, Murphy based her evaluation on probation reports, police reports, disciplinary reports from the Department of Corrections, and records from the state hospitals in which Roa had been housed.  She also reviewed Roa's psychosocial history, his educational and employment history, and his relationship history, as documented in his medical records and prior psychological evaluation reports.

---

problems, suicidal or homicidal tendencies, relationship and employment problems, past nonsexual violent offenses, past nonviolent sexual offenses, past supervision failure, multiple offenses within a short space of time, physical harm to the victims, use of weapons or threats of death, escalation of frequency, minimization or denial of offenses, condoning offenses, lack of realistic plans, negative attitudes toward intervention.

[5]     The SRA tool takes into consideration factors such as sexual preference for children, sexualized violence, sexual preoccupation, lack of emotional intimate relations with adults, emotional congruence with children, grievance thinking, pervasive anger, dysfunctional coping and self management skills.

### 1. Qualifying SVP offenses

Murphy opined that Roa had been convicted of two qualifying SVP offenses against two different victims in two separate cases. She then described the details of Roa's 1977 sexual assault against Helen and the 1984 rape against Michelle.

### 2. Mental disorder

Murphy diagnosed Roa with two mental disorders that predispose him to criminal sexual acts -- other specified paraphilic disorder, and antisocial or criminal personality disorder.

In formulating her opinions, Murphy considered, in addition to the two qualifying SVP offenses, Roa's 1967 sexual assault against Cecilia and the 1974 sexual assault against the two inebriated teenage girls. She stated that the four incidents involved attempted or completed sexual assaults against nonconsenting females and demonstrated a pattern of interest in sexually assaulting people.

Murphy found significant the fact that the assault against Cecilia occurred in an alley, as it showed isolation of the victim and perpetration of a sexual act. With regard to the 1974 assault against the teenaged girls, Murphy testified that a police report indicated that one of the victims saw blood in her underwear, evidence that the assault included completed penile or digital penetration.

Murphy responded affirmatively when asked whether she had reviewed a report of an interview with Roa's ex-wife and whether that report contained information suggesting sexual sadism. She then related Bertha's statements that Roa had been physically aggressive with her during sex, and sometimes beat her prior to sex. Murphy acknowledged that Roa's abuse of Bertha and his behavior during the 1977 offense against Helen had sadistic themes.

Murphy testified that antisocial personality disorder is one in which an individual has a lifelong pattern of lawless behavior and violating the rights of others. She found evidence of that behavior in Roa's extensive history of juvenile misconduct that included fighting, driving under the influence, and the sexual assault against Cecilia when Roa was 17. She stated that Roa's juvenile adjudications resulted in a succession of California Youth Authority commitments for a total of seven years. Murphy found additional evidence of the personality disorder in Roa's adult conduct, which included several drug related offenses, a robbery conviction, and an assault against two state hospital patients that had occurred the previous August. Murphy testified that a staff member who had witnessed the August assault believed Roa was experiencing auditory hallucinations at the time because he had cotton stuffed in his ears. Murphy further testified that an officer who interviewed Roa after the August attack said that Roa was not making sense, which suggested thought disorganization.

Murphy testified that Roa's history of meeting with the state hospital treatment staff was poor and that he had expressed delusional ideations that the hospital was a morgue and that the physicians were not really doctors.

### 3. Likelihood to reoffend

Murphy opined that Roa's assaultive behavior, and his refusal to participate in mental health and substance abuse treatment placed him at a higher risk of reoffending. She acknowledged that studies show a diminished propensity to commit rape among men over the age of 60, but noted that the research did not cover Roa's other, more diverse sexually assaultive behaviors such as oral copulation and digital penetration.

10

Murphy assessed Roa's risk of reoffending using the STATIC-99 and the STATIC-2000. He received a score of 4 under each of those diagnostic tools, placing him at a low moderate risk for reoffense under the STATIC-2000, and a moderate high risk under the STATIC-99. Murphy assessed Roa's risk of reoffending to be higher than what the statistical diagnostic tools indicated, however, because he was showing active symptoms of psychosis and refusing any treatment. Murphy opined that Roa's paraphilia for nonconsensual sexual relations makes him dangerous and that his antisocial personality disorder is an exacerbating factor that makes him more dangerous. Murphy further opined that Roa meets the criteria for an SVP because he has a qualifying mental disorder and appears to pose a serious and well-founded risk to the community.

**Defense evidence**

### *Dr. Douglas Korpi*

Douglas Korpi, a psychologist who had diagnosed and evaluated the risk of sex offenders since the mid-1980s, evaluated Roa in 2013 and again in 2014. Because Roa refused to be interviewed, Korpi based his evaluations on police reports, probation reports, court documents, and state hospital records, including notes of the nurses, rehabilitation therapists, and doctors who saw Roa on a daily basis. For the 2014 evaluation, Korpi also reviewed the 1999 district attorney investigator's report about Roa's alleged mistreatment of his ex-wife.

In 2013, Korpi diagnosed Roa with schizophrenia, antisocial personality disorder, and a mild intellectual deficit. He concluded that although these diagnoses predisposed Roa to violent criminal behavior, they did not predispose him to reoffending sexual conduct. He reasoned that Roa did not begin to exhibit psychotic conduct until the age of 39 and all of his criminal conduct occurred long before then. Korpi also assessed

11

Roa's risk for reoffending using the STATIC-2002 and the STATIC-99 and gave Roa a score of 4 under each of those actuarial instruments. He explained that people with a score of 4 reoffend four to sixteen percent of the time.

During his 2014 evaluation of Roa, Korpi's review of the district attorney investigator's report on Roa's ex-wife caused him to change his diagnosis to include sexual sadism. Despite this new diagnosis, Korpi maintained that Roa was not likely to sexually reoffend in a violent predatory manner given his moderate scores under the actuarial measurements, his advanced age, and the absence of any sadistic or sexual behavior in the past 30 years.

During cross-examination, Korpi admitted that although he had not diagnosed Roa with paraphilia, he could have made that diagnosis based on his review of a 1974 Pomona Police Department report describing the assault on the two girls in the van, and police reports containing the details of the assaults against Helen and Michelle.

### Dr. Michael Musacco

Psychologist Michael Musacco was assigned by the DSH to evaluate Roa in 2014. Because Roa refused to be interviewed, Musacco reviewed Roa's medical and law enforcement records.

Musacco opined that Roa has a qualifying mental disorder that predisposes him to commit sexual crimes -- specifically, a diagnosis of other specified paraphilic disorder. Musacco also diagnosed antisocial personality disorder, substance abuse disorder, and schizophrenia.

Musacco gave Roa a score of 4 using the STATIC-99, placing him in the category of moderate high risk of reoffending. He noted, however that the STATIC-99 is based entirely on historical factors and does not account for dynamic risk variables such as sexual preoccupation, and antisociality. Musacco stated

12

that although Roa met two of the three criteria for an SVP -- conviction of a qualifying sexual offense and a mental illness that predisposed him to commit sex crimes -- he was unlikely to reoffend in a sexually violent predatory manner because of his advanced age and the absence of any sexual conduct during his hospitalization. Musacco concluded that although Roa presented a risk, that risk did not rise to the level of a "serious and well-founded risk" of being a danger to the health and safety of others.

### *Dr. Hy Malinek*

Hy Malinek, a forensic psychologist and expert in SVP evaluations, was hired by the defense to evaluate Roa in 2011. Malinek attempted to interview Roa on four separate occasions. Roa refused to be interviewed for the first two attempts. On the third attempt in December 2011, Roa participated for approximately 15 minutes and then got up and walked out of the interview room. Roa arrived for the fourth interview attempt but refused to wait for Malinek to finish with another patient and left before his own interview could begin. Malinek based his evaluation on Roa's law enforcement and mental health records.

Malinek opined that although Roa may in the past have had a mental disorder that would predispose him to commit criminal sexual acts, he did not currently have such a disorder. Malineck based his opinion on the absence of adequate information from 1977 to the present that would indicate such a disorder.

Malinek acknowledged that Roa had an extensive criminal history, commencing at the age of 14 or 15, that included robberies, sexual offenses, and public intoxication. He further acknowledged that Roa had spent most of his life in custody, and had violated probation, thereby demonstrating a disregard for the law. He did not, however, diagnose Roa with paraphilia or sexual sadism and discounted the reports of abuse by Roa's ex-wife

13

because of inconsistencies in her statements. Malinek diagnosed Roa with polysubstance dependence and antisocial personality disorder based on his juvenile and adult criminal history but concluded that these disorders did not predispose Roa to commit sex crimes. He noted the absence of evidence in Roa's records of any sexual preoccupation in the past 31 years.

Malinek concluded that Roa was unlikely to reoffend based on his low actuarial scores and his advanced age. He disagreed with testimony that age was not a protective factor for individuals diagnosed with sexual sadism. Malinek concluded that Roa did not present a serious and well-founded risk of reoffending in a sexually violent, predatory manner if he were to be released.

## DISCUSSION

### I. Standard of review

A trial court's ruling on the admissibility of evidence, including one that turns on the hearsay nature of the evidence, is reviewed under the abuse of discretion standard. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

### II. General legal principles

Hearsay, defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated," is inadmissible unless it falls under an exception. (Evid. Code, § 1200, subd. (b).) A statement "offered for some purpose other than to prove the fact stated," however, is not hearsay. (Sen. Com. on Judiciary com., 29B Pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1200, p. 3.) This latter principle has been applied to allow expert witnesses to testify about their general knowledge in a specialized area without being subject to exclusion on hearsay grounds. (*Sanchez, supra*, 63 Cal.4th at p. 676.) "By contrast, an expert has traditionally been precluded from relating *case-specific*

14

facts about which the expert has no independent knowledge. Case specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*)

An exception to the general rule barring an expert from relating case-specific hearsay developed under the common law for medical diagnoses, as doctors often rely on patients' hearsay descriptions of their symptoms to form diagnoses.[6] (*Sanchez, supra,* 63 Cal.4th at p. 678.) This exception was recognized and given more general application in Evidence Code sections 801 and 802. (*Ibid.*) Evidence Code section 801 allows an expert to render an opinion "[b]ased on matter (including his special knowledge, skill experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801, subd. (b).) Evidence Code section 802 states that an expert may "state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion.

_____

[6] Another exception is expert testimony about property valuation, as "'courts recognized that experts frequently derived their knowledge by both custom and necessity from sources that were technically hearsay -- price lists, newspapers, information about comparable sales, or other secondary sources.' [Citations.]" (*Sanchez, supra,* 63 Cal.4th at p. 678.)

15

## III. The SVPA

Expert testimony, specifically testimony regarding diagnosis of a current mental disorder, is an important element in an SVPA civil commitment proceeding. Such a proceeding identifies persons who have committed a sexually violent offense and who have a current diagnosed mental disorder that makes it likely that they will commit sexually violent crimes in the future. The SVPA requires that such persons be confined and treated until they no longer present a threat to society. (Stats. 1995, ch. 762, § 1 (Sen. Bill No. 1143).)

An alleged SVP has the right to a jury trial, at which the prosecutor must prove beyond a reasonable doubt that the person was convicted of a qualifying sexually violent offense; has a current, diagnosed mental disorder that makes the person a danger to the health and safety of others; and that the mental disorder makes it likely the defendant will engage in sexually violent criminal behavior in the future. (§§ 6600, 6603, 6604; *People v. White* (2016) 3 Cal.App.5th 433, 448.)

### A. Conviction of a sexually violent offense

To qualify as an SVP, a defendant must have been convicted of at least one qualifying sexually violent offense. (§ 6600, subd. (a)(3).) Section 6600, subdivision (b) lists the offenses that qualify as predicate offenses under the SVPA. The existence of a predicate offense and the details underlying commission of that offense may be established by documentary evidence made admissible by section 6600, subdivision (a)(3). That statute allows admission of "documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals" to prove the existence of a prior qualifying offense as well as the details underlying the commission of the offense. (*Ibid.*)

16

Section 6600, subdivision (a)(3) creates a hearsay exception for the documentary evidence described in that statute, and for multiple-level-hearsay statements contained within such documents. (*People v. Otto* (2001) 26 Cal.4th 200, 208 (*Otto*).) As explained by the California Supreme Court, the expansive hearsay exception accorded by section 6600, subdivision (a)(3) was intended to relieve victims of the burden of testifying about the details of crimes committed many years ago:

> "As originally enacted, the SVPA did not permit the use of documentary evidence. (See Stats. 1995, ch. 763, § 3.) The Legislature modified the act after prosecutors complained that 'they must bring victims back to court to re-litigate proof of prior convictions.' [Citation.] . . . [¶] Thus, the Legislature apparently intended to relieve victims of the burden and trauma of testifying about the details of the crimes underlying the prior convictions. Moreover, since the SVP proceeding may occur years after the predicate offense or offenses, the Legislature may have also been responding to a concern that victims and other percipient witnesses would no longer be available. Given these purposes, the only reasonable construction of section 6600(a)(3) is that it allows the use of multiple-level hearsay to prove the details of the sex offenses for which the defendant was convicted. If the amendment to section 6600, subdivision (a) is construed as excluding multiple hearsay, i.e., victim statements, contained in probation and sentencing reports, then victims would be required to testify -- an interpretation that would defeat the apparent purposes of the amendment."

(*Otto, supra*, 26 Cal.4th at p. 208.)

The existence of a prior conviction for a sexually violent offense may also be established by documentary evidence. (Pen. Code, § 969b; *People v. Burroughs, supra*, 6 Cal.App.5th 378

17

(*Burroughs*); *People v. Dean* (2009) 174 Cal.App.4th 186, 196 (*Dean*).)  Penal Code section 969b allows the admission into evidence of records or certified copies of records "of any state penitentiary, reformatory, county jail, city jail, or federal penitentiary in which" the defendant has been imprisoned to prove that a person has been convicted of a crime.

Conviction of a qualifying sexually violent offense may support a determination that a person is an SVP, but it cannot be the sole basis for that determination.  (§ 6600, subd. (a)(3).)  The SVPA mandates that jurors "be admonished that they may not find a person a sexually violent predator based on prior offenses absent relevant evidence of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent behavior."  (*Ibid.*)

### B. *Diagnosed mental disorder*

The SVPA defines a current diagnosed mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others."  (§ 6600, subd. (c).)  To prove at trial that a defendant suffers from a mental disorder, the People have one or more experts evaluate the defendant to make a diagnosis.[7]  A trial court may order an alleged SVP to submit to

_____

[7]    Before a petition to commit a defendant as an SVP can be filed, the SVPA requires the defendant to be evaluated by two practicing psychiatrists or psychologists, who must both agree that the defendant comes within the statute.  (§ 6601, subd. (d).)  After the petition is filed, and before a trial on the petition commences, the defendant is entitled to a full evidentiary hearing to determine whether there is probable cause to believe he is likely to engage in sexually violent predatory criminal behavior upon release.  (§ 6602, subd. (a).)

18

a mental examination by an expert retained by the People (*People v. Landau* (2013) 214 Cal.App.4th 1, 25-26); however, defendants often refuse to meet with the expert. The diagnosis is therefore frequently based on documentary evidence such as state hospital records, police reports, probation reports, and prison records. (See *Burroughs, supra*, 6 Cal.App.5th 378.)

### C. *Likelihood of reoffending*

The third element the People must prove in order to commit a defendant as an SVP is that the defendant will likely engage in sexually violent criminal behavior as a result of a diagnosed mental disorder. (§ 6600, subd. (a).) A person is likely to engage in sexually violent criminal behavior if the jury finds that the person presents "*a substantial danger*, that is, a *serious and well-founded risk*, of committing such crimes if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 987-988, fn. omitted.) Expert testimony is admissible regarding the dangerousness of the defendant and the likeliness of the defendant to reoffend. (*People v. Therrian* (2003) 113 Cal.App.4th 609, 614-615.) Such testimony is typically based on diagnostic tools that are used to predict future violent sexual behavior. A common diagnostic tool for predicting violent sexual behavior is the STATIC-99,[8] "an actuarial instrument that allows an evaluator to place sexual offenders in different risk categories based on historical (static) factors such as age, marital status, the number of prior offenses, the relationship of the offender to the victims and the gender of the victims." (*Therrian*, at p. 612.) The STATIC-99 assigns the offender a numeric score that reflects a percentage chance of the offender being convicted of a future

_____

[8] Penal Code section 290.04, subdivision (b) designates the STATIC-99 as the State-Authorized Risk Assessment Tool for Sex Offenders (SARATSO) for adult males required to register as sex offenders.

19

sexual offense.  (*Ibid.*)  A score of 0-1 indicates a low risk of committing a new violent sexual offense, 2-5 indicates a moderate risk, and 6 indicates a high risk of reoffending.  (Couzens & Bigelow, Sex Crimes: Cal. Law & Procedure, *supra*, § 13:6, p. 13-28.)

## IV.  Hearsay and expert testimony in SVP proceedings

### A.  *Scope of permissible expert testimony*

As discussed, the existence of a qualifying SVP conviction and the details underlying the offense can be established by multiple-level hearsay evidence such as preliminary hearing and trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals.  (§ 6600, subd. (a)(3); *Otto, supra*, 26 Cal.4th at p. 208.)  Because the facts underlying the qualifying offense are admissible under section 6600, subdivision (a)(3), experts may relate those facts to the jury as the basis for their opinions.  (*Burroughs, supra,* 6 Cal.App.5th at p. 403.)  Experts may also testify that the defendant was convicted of a qualifying offense, as evidence of such a conviction is admissible under Penal Code section 969b.  (*Dean, supra*, 174 Cal.App.4th at p. 196.)  Finally, experts may testify as to a defendant's likelihood of reoffending.  (*People v. Therrian, supra*, 113 Cal.App.4th at p. 615.)

### B.  *Pre-Sanchez limitations on expert use of hearsay evidence*

At the time of Roa's trial, "the general rule was that 'out-of-court statements offered to support an expert's opinion are not hearsay because they are not offered for the truth of the matter asserted.  Instead, they are offered for the purpose of assessing the value of the expert's opinion.' [Citation.]" (*Burroughs, supra,* 6 Cal.App.5th at p. 405.)  That general rule, however, was not without limitation.  For example, experts are generally prohibited from disclosing the details of a defendant's state hospital and

custody records if those records have not been properly admitted into evidence.  (*People v. Landau* (2016) 246 Cal.App.4th 850, 876-877 (*Landau*); see also *Dean, supra*, 174 Cal.App.4th at p. 197.)

In *Dean*, experts testified in detail at the defendant's SVP trial about incidents disclosed in state hospital and custody records which had not been admitted into evidence.  These incidents included a drug sniffing dog "hit[ting] on defendant" while at the state hospital; defendant's derogatory statements to, and writings about, female hospital staff; his juvenile criminal offenses for arson, assault, burglary, and brandishing a firearm; and his alleged acts of rape, sodomy, and oral copulation while in custody.  (*Dean, supra*, 174 Cal.App.4th at pp. 197-200.)  Although the court in *Dean* found the testimony to be "highly inflammatory" and "of questionable reliability" (*id.* at pp. 200-201, fn. omitted), it concluded that the error was harmless because the trial court had instructed the jury not to consider expert testimony about statements made by other persons and sources for their truth.  (*Id.* at pp. 201-202.)

In, *Landau*, an expert in the defendant's SVP commitment trial testified in detail about the defendant's conduct in the state hospital, as documented in hospital records that were not admitted into evidence.  The testimony included manifestations of the defendant's obsessive-compulsive behavior, such as hoarding of food and newspaper clippings; his refusal to participate in treatment; his physical altercation with another patient over a menu; and specific instances in which he used epithets and racial slurs against other patients and hospital staff. (*Landau, supra*, 214 Cal.App.4th at p. 876.)  The court in *Landau* found admission of this hearsay evidence to be prejudicial because it "cast appellant [who had previously been found to be an SVP] in a most unfavorable light as someone who will not

21

follow rules, demonstrates no concern for others, and engages in some form of violence." (*Id.* at p. 877.) The court accordingly reversed the judgment. (*Ibid.*)

## V. *Sanchez*

Expert testimony that discloses hearsay evidence was further circumscribed by the California Supreme Court in *Sanchez.* In that case, a gang expert testified about statements the defendant had made to police officers, as documented in various police records that were not admitted into evidence. The expert had never met the defendant, but opined that the defendant was a gang member, based in part on the defendant's statements to the officers. (*Sanchez, supra*, 63 Cal.4th at pp. 672-673.) The Supreme Court held that the case-specific statements related by the expert concerning the defendant's gang membership constituted inadmissible hearsay because "[t]hey were recited by the expert, who presented them as true statements of fact, without the requisite independent proof." (*Id.* at p. 670.)

The court in *Sanchez* distinguished between expert testimony about general knowledge in the expert's area of expertise, which traditionally has not been excluded as hearsay, and testimony relating "*case-specific* facts," which has been subject to exclusion. (*Sanchez, supra*, 63 Cal.4th at p. 676.) The court observed that over time, the line between expert testimony as to general background information and case-specific hearsay had become blurred, and that trial courts sought to remedy the problem by instructing jurors that matters admitted through an expert should not be considered for their truth but only as the basis for the expert's opinion. (*Id.* pp. 678-679.) This approach, the Supreme Court reasoned, obviated the "need to carefully distinguish between an expert's testimony regarding background information and case-specific facts." (*Id.* at p. 679.) The court

22

articulated the problem as follows: "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' [citation] of the hearsay statement." (*Id.* at pp. 682-683.)

The court in *Sanchez* rejected the not-for-the-truth limitation when applied to expert basis testimony and adopted in its place the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. omitted.) The court also set forth certain guidelines for admissible and inadmissible expert basis testimony. Experts may rely on background information accepted in the field of expertise, information within their personal knowledge, and nontestimonial hearsay properly admitted under a statutory hearsay exception. (*Id.* at p. 685.) An expert may also "*rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. . . . [¶] What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."[9] (*Id.* at pp. 685-686.)

_____

[9] The court in *Sanchez* imposed additional limitations, not applicable here, on testimonial hearsay statements offered by the prosecution in a criminal case. (*Sanchez, supra*, 63 Cal.4th at p. 680.)

23

## VI. *Burroughs*

*Burroughs* is the only published appellate court decision to date that applies the principles articulated in *Sanchez* in the context of an SVP commitment proceeding. In *Burroughs*, the People's experts testified about the facts of the defendant's qualifying offenses and opined that those offenses constituted qualifying prior convictions under the SVPA. (*Burroughs, supra*, 6 Cal.App.5th at pp. 384-385.) The defendant objected on the ground that experts are not qualified to opine on what constitutes a qualifying prior conviction or a sexually violent, predatory offense, and that opinion testimony on these subjects would usurp the function of the jury. (*Id.* at pp. 398-401.) The court in *Burroughs* agreed that "[e]xperts are not necessary . . . to establish that the defendant suffered a conviction for a sexually violent offense." (*Id.* at pp. 402-403.) The court pointed out, however, that the fact that the defendant had been convicted of an enumerated SVPA offense had been proven by the introduction of "a 'section 969b prison packet'" and that the People had proven that the conviction was for a sexually violent offense by admitting documentary evidence made admissible into evidence by section 6600, subdivision (a)(3). (*Ibid.*) Because the facts underlying the defendant's qualifying offenses had been proven independently by admissible documentary evidence, the court in *Burroughs* concluded that "the experts were permitted to relate the facts to the jury as the basis of their opinions" consistent with the Supreme Court's holding in *Sanchez*. (*Burroughs*, at p. 403.)

The defendant in *Burroughs* also objected to expert testimony and documentary evidence referring to uncharged offenses and conduct other than his qualifying offenses. (*Burroughs, supra*, 6 Cal.App.5th at p. 408.) He argued that while section 6600, subdivision (a)(3) allows admission of

24

evidence pertaining to his qualifying offenses, there was no basis to admit evidence regarding offenses that were dismissed, uncharged, or otherwise nonqualifying.  The defendant had preserved his objections to documentary evidence containing such information by adequately specifying, in a motion in limine, the inadmissible portions of the challenged documentary evidence. (*Id*. at p. 409.)  The court in *Burroughs* reviewed the challenged documentary evidence, which included documents enumerated in section 6600, subdivision (a)(3), and found that they contained not only references to uncharged offenses, but also "'information about appellant's prior record, adult history, personal history, physical/mental/emotional health, education, employment, and terms and conditions of probation.'" (*Burroughs*, at p. 410.) Because this information was not used to prove the qualifying offenses, the court in *Burroughs* concluded that documents and any portions of documents containing such information was inadmissible hearsay and that the trial court erred by allowing the experts to relate such hearsay to the jury.  (*Id*. at pp. 410-411.)  The court further concluded that the evidentiary errors were prejudicial because the documentary evidence and expert testimony "related a significant amount of hearsay to the jury" by describing, "in lurid detail, numerous sex offenses that appellant was not charged with or convicted of committing." (*Id*. at p. 412.) The court in *Burroughs* accordingly reversed the judgment and remanded the matter to the trial court for further proceedings.

## VII.  The instant case

In the instant case, Roa contends his SVP commitment must be reversed because the trial court committed prejudicial error by admitting the following inadmissible hearsay evidence: (1) expert testimony regarding the facts and circumstances of the qualifying predicate offenses; (2) expert testimony concerning the content of the 1999 district attorney investigator reports; and (3)

expert testimony and documentary evidence regarding Roa's personal life, employment status, substance abuse history, and conduct in the state hospital. Roa further contends the trial court violated his due process rights by allowing the People to use unreliable hearsay from an investigation conducted decades after the subject events.

### A. *Testimony regarding predicate offenses*

Roa claims expert testimony regarding the case-specific facts of his qualifying offenses is inadmissible hearsay under *Sanchez*. We disagree. The limitation on expert testimony imposed by the Supreme Court in *Sanchez* applies to case-specific facts that are not independently proven or covered by a hearsay exception. (*Sanchez, supra*, 63 Cal.4th at p. 686.) Here, the facts underlying Roa's qualifying offenses were independently proven by documentary evidence such as preliminary hearing transcripts and probation and sentencing reports that were admitted pursuant to section 6600, subdivision (a)(3). (§ 6600, subd. (a)(3); *Otto, supra*, 26 Cal.4th at pp. 207-208.) Because the facts were independently proven, the experts were permitted to relate those facts to the jury as the basis for their opinions. (*Sanchez, supra*, at p. 684.)

### B. *District attorney investigator reports*

Roa contends the trial court committed prejudicial error and violated his due process rights by allowing the experts to rely upon and testify as to statements contained in two reports prepared by a district attorney investigator in 1999 about events that occurred decades earlier, specifically, a 1967 attempted rape that resulted in a juvenile adjudication for assault, a 1974 arrest for the attempted rape of two teenage girls, and allegations by Roa's ex-wife about abusive conduct during their marriage. The trial court excluded the reports themselves as inadmissible

26

hearsay but allowed the experts to rely upon the reports and testify as to their contents as the basis for their opinions.

### 1. Expert reliance on reports

Roa cites *People v. Carlin* (2007) 150 Cal.App.4th 322 (*Carlin*) as support for his argument that allowing the experts to consider and rely upon the investigator's reports violated his due process rights. *Carlin* involved use of investigator reports in an SVP commitment proceeding to prove the existence of a qualifying predicate offense. It did not address an expert's reliance on such reports as a basis for opinion testimony (see *id.* at pp. 337-345) and is therefore inapposite

In *Carlin,* the People presented, as evidence that the defendant had committed a qualifying SVP offense, two investigator's reports prepared in 2000 and 2001 containing victim statements about a 1990 incident that resulted in the defendant's 1991 conviction. (*Carlin, supra*, 150 Cal.App.4th at pp. 336-337.) Before the SVP trial commenced, the trial court denied the defendant's request to have the victim testify about the 1990 incident and the subsequent statements made to the investigator but admitted the reports as evidence that the underlying offense for the 1991 conviction involved substantial sexual conduct with a child under the age of 14.[10] (*Id.* at p. 337, 342.) The appellate court in *Carlin* concluded that use of the reports to prove a qualifying SVP offense violated the defendant's due process rights. (*Ibid.*) The court focused in particular on the reliability of the 2000 and 2001 statements, noting that they were

_____

[10] Before 2006, a sex crime against a child under the age of 14 qualified as a predicate offense under the SVPA if the offending act involved "substantial sexual conduct." (Former § 6600.1; Stats. 1996, ch. 461, § 3.) In 2006 the SVPA was amended to provide that any designated sex crime against a child under the age of 14 qualifies as a predicate offense. (§ 6600.1, amended by initiative measure, Prop. 83, § 25, eff. Nov. 8, 2006.)

27

inconsistent with the victim's 1991 statements, had not been corroborated, and were not made in close proximity to the crime. (*Id.* at p. 341.) The court found that a critical factor demonstrating the reliability of the victim's hearsay statements was absent -- "the fact that the defendant 'was convicted of the crimes to which the statements relate[,]'" i.e., "that 'some portion, if not all, of the alleged conduct will have been already either admitted in a plea or found true by a trier of fact after trial.'" (*Ibid.*, quoting *Otto, supra*, 26 Cal.4th at p. 211.) The court in *Carlin* noted that the defendant's 1991 conviction was the result of a plea that could not have contemplated the victim's 2000 and 2001 statements, which were made 10 years after the plea and which vary greatly from the victim's statements at the time of conviction." (*Carlin, supra*, at p. 341.)

 *Carlin* did not address an expert's consideration of or reliance on an investigator's reports as a basis for opinion testimony. That case accordingly does not support Roa's argument that allowing the experts in this case to consider the investigator's reports violated his due process rights.

 The investigator reports, even if inadmissible hearsay, could be relied upon by the experts in forming their opinions. Evidence Code section 801, subdivision (b) allows an expert to render an opinion "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally made known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." The California Supreme Court reaffirmed this principle in *Sanchez*: "Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in*

28

*general terms* that he did so." (*Sanchez, supra*, 63 Cal.4th at p. 685.) Roa has cited no authority that would preclude an expert from relying on the investigator reports as a basis for their opinions. The trial court did not err by allowing the experts to do so in this case.

## 2. Expert testimony on content of investigator reports

That the experts could rely on the investigator reports in forming their opinions does not mean they could relate case-specific facts contained in those reports to the jury, unless those facts were independently proven by competent evidence or covered by a hearsay exception. (*Sanchez, supra*, 63 Cal.4th at p. 686.) The experts in this case testified extensively about case-specific facts they obtained from the investigator's reports and treated those facts as true and accurate to support their opinions. The investigator's reports themselves were not admitted into evidence, and there is no other evidence of the case-specific facts concerning the 1967 assault against Cecilia, Roa's alleged abuse of his ex-wife, or his 1974 arrest for the alleged sexual assault against two teenage girls. Admission of expert testimony relating case-specific facts about these incidents was error. (*Sanchez, supra,* 63 Cal.4th at pp. 684-686.)

## C. *Expert testimony on content of state hospital records*

The People concede that Roa's state hospital and medical records are hearsay, and that those records were not admitted into evidence pursuant to any hearsay exception. They further concede that expert testimony relating information contained in the records was inadmissible hearsay but claim that the error in allowing such testimony was harmless. We address prejudice, *post,* in subsection E.

29

### D. Documentary evidence

Roa contends the trial court erred by admitting into evidence seven documents he claims should have been redacted or excluded in their entirety: (1) exhibit 11, the probation report concerning the incident involving the victim Helen, case number A522726; (2) exhibit 12, the transcript of Roa's no contest plea in case number A522726; (3) exhibit 13, the transcript of the sentencing hearing in that same case; (4) exhibit 16, the probation officer's report for the case involving the victim Michelle, case number A531314; (5) exhibit 17, a supplemental probation officer's report in case number A531314; (6) exhibit 18, a certified copy of the CLETS printout listing Roa's criminal history; and (7) exhibit 21a-21e (exhibit 21), a prior prison term information packet prepared pursuant to Penal Code section 969b.

### 1. Forfeiture of objections

Roa's trial counsel objected to the victim impact statement portions of exhibits 11 and 16 and Michelle's statement in exhibit 16 that Roa should be put away for life as unduly prejudicial pursuant to Evidence Code section 352. The trial court agreed and ordered those sections redacted. Roa now claims that additional portions of exhibits 11 and 12 relating to his family, personal life, employment status, substance abuse history, and criminal record should have been redacted because this information does not prove the details of the qualifying offense. He further contends that pages 10 and 11 of exhibit 11 should have been excluded because they do not come within the hearsay exception accorded by section 6600, subdivision (a)(3). He did not raise these additional objections in the trial court below and accordingly forfeited them on appeal. (*People v. Doolin* (2009) 45 Cal.4th 390, 448 (*Doolin*).)

30

Roa's trial counsel objected to exhibit 18, a certified copy of the CLETS printout detailing Roa's criminal history on the grounds that it was prejudicial, cumulative of the abstract of judgment, and did not prove prior convictions. The trial court ruled that the printout was relevant because the experts relied on it to support their diagnosis of antisocial personality disorder. The CLETS printout is admissible under the official records exception to the hearsay rule (*People v. Martinez* (2000) 22 Cal.4th 106, 134), and Roa has demonstrated no error in the trial court's ruling.

As to exhibit 21, the prior prison packet prepared pursuant to Penal Code section 969b, Roa's trial counsel objected to the portion containing the prison chronological history logs on the ground that they did not "show[] anything in regards to his -- the prior convictions that the People need to prove in this case." The trial court overruled the objection because the logs showed disciplinary write-ups in prison that the experts relied upon as the basis for their antisocial personality disorder diagnosis. In this appeal, Roa now contends the records do not come within section 6600, subdivision (a)(3), and are prejudicial and irrelevant. He failed to raise these objections in the trial court below and accordingly forfeited them on appeal. (*Doolin, supra*, 45 Cal.4th at p. 448.) Roa failed to raise any objection in the trial court below to exhibits 12, 13, and 17 and forfeited his objections to those documents as well. (*Ibid.*)

### 2. Ineffective assistance

Roa contends that if his trial counsel's failure to object to the documentary evidence he now challenges on appeal resulted in a forfeiture of those objections, he was denied effective assistance of counsel under the Sixth Amendment.

To establish ineffective assistance of counsel, a defendant must show that counsel's representation failed to meet an

31

objective standard of professional reasonableness and that he was prejudiced by that deficient representation. To demonstrate prejudice, the defendant must show that absent the deficient representation, there is a reasonable probability the result would have been more favorable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v Frye* (1998) 18 Cal.4th 894, 979.) A conviction may not be reversed on appeal for ineffective assistance of counsel unless the record shows there was no rational tactical purpose for counsel's act or omission. (*People v. Frye*, at p. 979.)

Roa did not meet his burden of showing deficient performance. He concedes that exhibit 18 is admissible under *People v. Martinez, supra*, 22 Cal.4th 106. Section 6600, subdivision (a)(3) specifically allows admission of exhibits 11, 12, 13, 16, and 17, and Penal Code section 969b allows admission of exhibit 21. Roa also concedes that many of the entries in the objected to portions of the exhibits are irrelevant, "meaningless to the jury" and not prejudicial. For these reasons, we conclude that he failed to establish ineffective assistance of counsel.

### E. Prejudice

Admission of the hearsay testimony in this case was prejudicial. The experts related a substantial amount of hearsay to the jury, including the details of sex offenses Roa was not charged with or convicted of committing, such as the 1967 assault against Cecilia, his 1974 arrest for an alleged rape or attempted rape against two teenage girls, and his alleged sexual abuse of his ex-wife during their marriage. Vognsen testified that he relied on the investigator's report concerning Roa's alleged abuse of his ex-wife as the basis for diagnosing Roa with sexual sadism, that he relied on the assault against Cecilia as the basis for a conduct disorder diagnosis, and that he relied on the attempted rape of the two teenage girls as the basis for the paraphilia

32

diagnosis.  Vognsen testified that he did not take into account the assault against Cecilia when evaluating Roa's risk of reoffending using the STATIC-99 diagnostic instrument because that instrument takes into account only formal charges for sexual offenses, and Roa was not charged with a sexual offense against Cecilia.  Vognsen explained that had Roa been charged with a sexual assault rather than a simple assault against Cecilia, he would have received a higher score under the STATIC-99 test, indicating a higher risk of reoffending.

Murphy testified that Roa's assault against Cecilia occurred in an alley, consistent with a pattern of isolating the victim and attempting to perpetrate a sexual act.  Murphy further testified that Roa's beating of his ex-wife before sex had a sadistic theme.

Korpi testified that his review in 2014 of Roa's ex-wife's statements about Roa's abusive behavior during sex caused him to change his diagnosis to include sexual sadism.

Had this inadmissible evidence been excluded from the trial, there is a reasonable probability that the jury would have returned a verdict more favorable to Roa.  (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

### F.  Due process

Roa contends the trial court's admission of case-specific hearsay violated his due process right of confrontation.  "There is no right to confrontation under the state and federal confrontation clause in civil proceedings, but such a right does exist under the due process clause.  [Citation.]"  (*Otto, supra,* 26 Cal.4th at p. 214.)  Because we conclude that the admission of inadmissible hearsay prejudiced Roa and requires reversal, we need not determine whether admission of the same evidence also violated his due process right of confrontation.  (*Landau, supra*, 246 Cal.App.4th at p. 878.)

**DISPOSITION**

The judgment is reversed.

**CERTIFIED FOR PUBLICATION**


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
GOODMAN

---

\* Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.