Filed 3/15/22  P. v. Aguirre CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LOCADIO AGUIRRE,<br><br>    Defendant and Appellant. | 2d Crim. No. B312565<br>(Super. Ct. No. 1499382)<br>(Santa Barbara County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered the opinion filed herein on February 22, 2022, be modified as follows:

On page 7, after the first full paragraph, the following paragraph is added:

> In addition, any error in excluding the evidence did not result in a miscarriage of justice and was harmless in light of Aguirre's failure to participate in treatment, failure to acknowledge he had a problem, and belief that he did not need treatment.  (Evid.

Code, § 354; *People v. Allen* (2008) 44 Cal.4th 843, 871-874.)

There is no change in judgment.
Appellant's petition for rehearing is denied.

YEGAN, Acting P. J. PERREN, J. TANGEMAN, J.

Filed 2/22/22  P. v. Aguirre CA2/6 (unmodified opinion)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>　Plaintiff and Respondent,<br><br>v.<br><br>LOCADIO AGUIRRE,<br><br>　Defendant and Appellant. | 2d Crim. No. B312565<br>(Super. Ct. No. 1499382)<br>(Santa Barbara County) |

　　　　Locadio Aguirre appeals from the judgment committing him to a state hospital as a Sexually Violent Predator (SVP).  (Welf. & Inst. Code, § 6600 et seq.)  He contends:  (1) the trial court denied him due process and a fair trial when it refused to consider potential parole conditions, (2) the trial court erred when it admitted evidence regarding a male victim, (3) counsel rendered ineffective assistance, and (4) cumulative error requires reversal.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

　　　　Aguirre was convicted of multiple counts of committing lewd acts with a child under 14 (Pen. Code, § 288,

subd. (a)), and sentenced to prison. Prior to his release, the People filed a petition to commit Aguirre as an SVP. The parties stipulated to a court trial. Aguirre was 93 years old at the time of trial.

### 1999 offenses

In 1999, when Aguirre was 71 years old, he lured an eight-year-old girl (Jane Doe 1) to the porch of his house to give her some money. He kissed her mouth and touched her vagina. Several weeks later, he invited her to his residence. He laid her on the bed, got on top of her, kissed her mouth, placed his hands under her skirt and panties, and rubbed her vagina skin-to-skin. Based on this conduct, he was convicted of two counts of lewd conduct with a child under the age of 14 (Pen. Code, § 288, subd. (a)) and was sentenced to three years in prison.

Aguirre made inconsistent statements regarding these crimes. When interviewed by police, he denied touching the girl. He later admitted touching her but denied knowing why he did so. He initially told Harry Goldberg, Ph.D., a psychologist employed by the Department of State Hospitals (DSH), that he touched the girl because her vagina itched, but he later denied touching her vagina. He told William Damon, Ph.D., another psychologist employed by DSH, that the girl instigated the incident. He denied that any sexual behavior occurred. He said the girl, her mother, and the police all lied. He said the girl's mother said if he did not pay her $40,000, "he would remember her for the rest of his life."

### 2008 offenses

In 2008, when Aguirre was 80 years old, he rented a room to a family with an eight-year-old girl (Jane Doe 2). When her mother was in the shower, he fondled the girl's vagina over

2

her clothes. He unsuccessfully attempted to lure her to the bedroom. On another occasion, he kissed her on the mouth. Based on this conduct, he was convicted of two counts of lewd conduct with a child under the age of 14 (Pen. Code, § 288, subd. (a)) and was sentenced to 10 years in prison.

When police interviewed Aguirre, he initially denied committing the crimes. He later told police and Dr. Goldberg the girl placed his hand on her vagina. He told Dr. Damon that the girl's mother said if he did not pay her $15,000, "he would remember her for the rest of his life."

### *Dr. Goldberg's testimony*

Dr. Goldberg evaluated Aguirre four times between 2016 and 2020. He diagnosed Aguirre with pedophilia, sexually attracted to both, nonexclusive type. Pedophilia is a "chronic condition," and there is "no evidence that pedophilia would subside simply by being incarcerated and not going through treatment."

Dr. Goldberg believed that Aguirre was at risk to reoffend despite his age. He was a statistical "outlier" because his first conviction occurred at age 71 and he reoffended at age 80. Dr. Goldberg found no "protective factors" that would reduce the risk of reoffense.

Aguirre was not amenable to community treatment because he "doesn't believe treatment is necessary" and "doesn't think he has a problem." He attended treatment at the state hospital only briefly. He was "not motivated to enter treatment" and gave "every excuse in the book not to go to treatment."

In Dr. Goldberg's opinion, Aguirre's disorder predisposed him to commit sexual acts. He did not take responsibility for his behavior. He committed the offenses even

3

though it disrupted his life by affecting his relationships with the victims' families and resulted in prison terms. Dr. Goldberg concluded that Aguirre was an SVP and it was necessary to keep him in custody to ensure the safety of the community.

### Dr. Damon's testimony

Dr. Damon completed six reports about Aguirre between 2016 and 2021. He diagnosed Aguirre with pedophilic disorder, sexually attracted to both, nonexclusive type. Although sex offender treatment programs were free and convenient in the hospital, Aguirre attended only three sessions. He said he would not seek sex offender treatment if released but would go if required. He said "there was no need for him to stay away from children," and he "could be around hundreds of children." Dr. Damon found no "protective factors" that would reduce the risk of recidivism.

Dr. Damon testified that Aguirre's disorder predisposed him to commit sexual acts. He had "serious difficulty controlling his sexual-offending behavior." Outpatient treatment would not be appropriate because he was unwilling to participate, dishonest about his conduct, and "completely unaware of the risk he poses." Dr. Damon concluded that Aguirre posed a "serious and well-founded risk to children if released."

### Aguirre's testimony

Aguirre testified that he did not know if he had a problem with sexual attraction to children. He said, "if I would be amongst 8, 10, or 20 kids, I wouldn't even touch their hair or their head or anything. I have sworn before God to not commit any more errors."

He started a treatment program at the hospital, but "the professor there gave me so many hours of papers to fill out,

4

and I had to write things, and I don't know how to read and write, not even in Spanish. I don't know anything." Due to his poor eyesight, if he were in sex offender treatment in the community, he could only listen. He said he "could listen to everything" and "could do what I'm told to do." But he admitted he had not listened to the sex offender treatment program in the hospital.

### *Verdict*

The trial court found Aguirre was an SVP and committed him to Coalinga State Hospital for an indeterminate term. (Welf. & Inst. Code, § 6604.)

## DISCUSSION

### *Sexually Violent Predator Act*

An SVP is a person who: (1) was "convicted of a sexually violent offense against one or more victims," (2) "has a diagnosed mental disorder," and (3) is "a danger to the health and safety of others" because he is "likely" to "engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1).) We "'review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below.'" (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 352.)

It was undisputed that Aguirre was convicted of sexually violent offenses and had a diagnosed mental disorder. The only issue at trial was whether he posed a danger of engaging in sexually violent criminal behavior. Aguirre contends that properly admissible evidence does not support such a finding. We disagree.

5

### *Parole conditions*

Aguirre first contends the trial court denied him due process and a fair trial when it refused to consider potential parole conditions if he were not committed as an SVP. He has forfeited this issue.

At trial, Aguirre said he wished to call a parole officer regarding conditions that would be imposed if he were paroled to the high-risk containment unit for sex offenders. He offered to introduce evidence of "highly restrictive parole terms, which include sex offender treatment . . ., high supervision, oftentimes GPS monitoring, et cetera." But he stated that the prosecution's objection pursuant to *People v. Krah* (2003) 114 Cal.App.4th 534 (*Krah*) was "well taken" because *Krah* allows only evidence of whether the defendant "would be amenable to voluntary treatment as opposed to coerced treatment."

Aguirre said that evidence of the available treatment while on parole would be relevant because he would testify that he wants to participate in treatment, that the evidence would be "introduced for a limited purpose," and "other SVP lawyers introduce this material for various purposes." The trial court stated that involuntary treatment was not relevant, but the parole officer could testify about the availability of voluntary treatment in Santa Barbara. Aguirre did not call the parole officer as a witness.

Aguirre concedes the trial court was required to follow *Krah, supra*, 114 Cal.App.4th 534, and "does not contend that the trial court improperly exercised its discretion or otherwise erred." Instead, he contends for the first time on appeal that he is likely to be on parole for the rest of his life, and

applying *Krah* to his case deprived him of due process and a fair trial.

Aguirre forfeited the due process and fair trial contentions by not asserting them in the trial court. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Nor did he ask the trial court "to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal." (*Id.* at p. 436.)

### *Evidence regarding male victim*

Aguirre contends the trial court erred in allowing evidence that he once molested a male victim. We are not persuaded.

Aguirre made a motion in limine to prohibit expert witnesses from testifying about case-specific hearsay, including information from the probation reports regarding a male victim. (*People v. Sanchez* (2016) 63 Cal.4th 665, 686 (*Sanchez*).) The trial court ruled that the evidence was admissible only as a basis for explaining the numerical outcome of the Static-99 assessments, but the experts could not testify to factual details of the incident.

Dr. Goldberg administered the Static-99R, which measures the risk posed by sex offenders. He said the test was "not very helpful in this case" because there are few statistics for offenders in their 70s, 80s, or 90s. On direct examination, he did not discuss how the test was scored or mention the male victim.

During cross-examination, however, Aguirre asked Dr. Goldberg about the point included in the score for a male victim. Aguirre elicited evidence that the boy made the allegation in 2008, that Dr. Goldberg did not speak with the

7

victim, that Aguirre was charged with the offense, and that it did not result in a conviction.

Dr. Goldberg testified that, including the point for the male victim, the total Static-99R score was 1, which indicates an "average risk." Without considering the male victim, Aguirre would score 0, which indicates a "below-average risk." Either way, he said the result is "not a tremendous difference as far as risk," and excluding consideration of the male victim would not change his opinion.

The Static-99R was also administered by Dr. Damon. Aguirre received two points for prior sexual offenses, one point for having unrelated victims, and one point for having a male victim. Aguirre objected regarding the male victim. The court responded, "I've sustained the objection as to case-specific details. The scoring is admissible."

Dr. Damon deducted three points on the Static-99R because Aguirre was over age 60. As a result, his total score was 1. In Dr. Damon's view, there were "clear limitations" to the usefulness of the Static-99R because Aguirre was "a statistical outlier" whose initial and subsequent offenses all occurred after the age of 60. Dr. Damon said his overall opinions in the case would not change if Aguirre scored 0 rather than 1.

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) There was no abuse of discretion here.

"[N]othing precludes the experts from, in forming their opinions, relying on inadmissible hearsay 'that is of a type that reasonably may be relied upon by' those experts." (*Walker v.*

8

*Superior Court* (2021) 12 Cal.5th 177, 202.) An expert may "*rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that [they] did so." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.)

We reject Aguirre's implicit argument that *Sanchez*, *supra*, 63 Cal.4th 665, requires that experts strictly adhere to the Evidence Code when they score a standardized test. Here, the experts testified that they assigned one point for a male victim, but related no details on direct examination. Aguirre cannot complain that his own counsel elicited additional facts regarding the alleged victim. (*People v. Brownlee* (1977) 74 Cal.App.3d 921, 932.)

Even if admission of the evidence was error, it was harmless because: (1) the doctors' conclusion that Aguirre was dangerous was made *despite* his scores on the Static-99R, not because of them; (2) the point added for the male victim did not change the doctors' opinions; and (3) the trial court gave no indication that it placed any significance on the very limited information about a male victim. (Cf. *People v. Burroughs* (2016) 6 Cal.App.5th 378, 412 [hearsay relating "in lurid detail, numerous sex offenses" was prejudicial].) In fact, the court was aware of the impact of *Sanchez* on the evidence, and of its duty to consider only admissible evidence.

### Ineffective assistance of counsel

Aguirre contends his counsel rendered ineffective assistance when he failed to object to inadmissible evidence contained in prosecution exhibits. We disagree.

9

At the end of the People's case, without objection, the court admitted six certified copies as exhibits: (1) summary criminal history (rap sheet), (2) prison records (Pen. Code, § 969b), (3) conviction packet for the 1999 case, (4) conviction packet for the 2008 case, (5) Dr. Goldberg's report, and (6) Dr. Damon's report. Some hearsay in the probation reports in the conviction packets was redacted.

Ineffectiveness of counsel requires that counsel's "acts or omissions were outside the wide range of professionally competent assistance" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 690, 694.) This test applies to SVP cases. (*People v. Yates* (2018) 25 Cal.App.5th 474, 487-488.)

Counsel's performance was not deficient regarding the rap sheet, prison records, or, except as noted below, the conviction packets (exhibits 1-4). They were admissible as documentary evidence to show the existence of the 1999 and 2008 convictions ("the qualifying offenses") and their details. (Welf. & Inst. Code, § 6600, subd. (a)(3).) While some of the documents were cumulative to other evidence, "trial courts are not required to exclude all cumulative evidence." (*People v. Lang* (1989) 49 Cal.3d 991, 1016.)

Other information in the documents may have been inadmissible but was innocuous: misdemeanor convictions for prostitution and making illegal loans in the 1999 case; abstracts of judgment showing restitution fines, custody credits, and AIDS

10

testing orders; and a chronological log of movements between facilities. (See *People v. Roa* (2017) 11 Cal.App.5th 428, 453.)

Aguirre contends that the rap sheet shows "multiple Penal Code section 288, subdivision (a), charges which did not appear to result in convictions." But these entries appear to relate to events arising from the qualifying offenses (arrest, delivery to prison, etc.).

The probation report in the conviction packet for the 1999 case included a statement from the victim's mother regarding the victim's fear of Aguirre and the possibility of future counseling sessions. This information was admissible as a "probation and sentencing report[]" relating "details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim" (Welf. & Inst. Code, § 6600, subd. (a)(3)), and refuted Aguirre's claim that the victim desired sexual contact. The probation report included opinions of psychologists (Pen. Code, § 288.1), the prosecutor, the defense attorney, and the probation officer, which included both statements helpful to Aguirre (e.g., expressions of remorse, recommendations for probation in lieu of prison, character references) and negative comments (e.g., misuse of position of trust and lack of sincere empathy and remorse). Aguirre did not have the right to include only the portions of statements that were helpful and exclude the unhelpful parts. (See Evid. Code, § 356.) Counsel could have made a competent tactical decision that, on balance, the documents were helpful to his case.

Counsel's performance was deficient when he failed to object to a letter attached to the probation report in the 1999 conviction packet from a woman identified as Y.S. She said that in approximately 1980, when she was 10 years old, Aguirre lured

11

her to his basement on the pretext of selling her a bicycle. He asked her to sit in his lap and told her not to tell anyone. She left without further incident or injury.

Counsel's performance was also deficient when he failed to object to portions of Dr. Goldberg's and Dr. Damon's reports regarding complaints that Aguirre molested additional girls. Dr. Goldberg's report stated that in addition to the qualifying offenses, Aguirre "has also been accused of molesting other children as well that did not result in any charges or convictions." Dr. Damon's report described complaints by girls identified as Jane Doe 3 (Y.S.) through Jane Doe 7, obtained from a probation report and a police report. Jane Doe 4 stated that on three occasions when she was eight years old in the mid-1980s, Aguirre stood her on a toilet seat, removed her shirt, pulled down her pants and underwear, and put one or two fingers inside her vagina. Jane Does 5 and 6 said that when they went to Aguirre's house to sell Girl Scout cookies in the 1990s, he grabbed their vaginal areas over their clothing. Jane Doe 7 told her mother that Aguirre "touched her" several years before 1999, but provided no further information. Aguirre denied that each of these incidents occurred.

Dr. Damon's report referred to these incidents in diagnosing Aguirre, in concluding his sexual offenses were predatory, and in scoring the Violence Risk Scale-Sexual Offense Version (VRS-SO). He stated that Aguirre "offended on children in his 50s, 60s, 70s, and 80s."

Experts' reports are subject to the same hearsay limitations as their testimony: case-specific facts gleaned from secondhand sources about incidents other than the qualifying convictions are inadmissible. (*People v. Superior Court*

*(Couthren)* (2019) 41 Cal.App.5th 1001, 1012, 1021.) "[N]o statutory exception to hearsay permits the wholesale admission of expert evaluation reports at an SVP trial." (*Id.* at p. 1012.) And "[g]enerally, evidence of mere arrests that do not result in convictions is inadmissible because such evidence invariably suggests the defendant has a bad character." (*People v. Williams* (2009) 170 Cal.App.4th 587, 609, fn. omitted.) But where, as here, the admissible evidence is overwhelming, the error is harmless. (*Id.* at p. 613.)

Aguirre has not established the second prong of his claim of ineffective assistance of counsel: that "it is reasonably probable "'that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"" (*People v. Yates*, *supra*, 25 Cal.App.5th at p. 488.) The additional victims were not mentioned in Dr. Goldberg's or Dr. Damon's testimony, or by either counsel.

The experts' reports had also been admitted as exhibits at the probable cause hearing, which was heard by the same judge. (Welf. & Inst. Code, § 6602.) The court ruled at that time that details about additional victims were not relevant. Although it read the experts' reports at trial, the court did not mention the additional victims. In making its ruling, the court stated "that the rulings by the Court were consistent with *Sanchez*, *supra*, 63 Cal.4th 665, and that the experts were allowed to give their opinions, but they did not relate any case-specific facts that were not supported—independently proven." This shows that the court, sitting as the trier of fact, was aware of the limitations on admissible evidence imposed by *Sanchez*.

13

In a court trial, "" "a trial court is presumed to ignore material it knows is incompetent, irrelevant, or inadmissible." [Citation.] "Only proof that the evidence actually figured in the court's decision will overcome these presumptions. [Citations.] Clearly, the mere fact that the court heard or read the evidence is not sufficient to overcome the presumptions."" (*People v. Presley* (2021) 65 Cal.App.5th 1131, 1143.) Here, as in *Presley*, the trial court was cognizant of *Sanchez*, *supra*, 63 Cal.4th 665, and did not refer to any inadmissible case-specific facts. We presume the trial court did not consider the information regarding the uncharged victims.

This is not a case where "the improperly admitted hearsay permeated the entirety of appellant's trial and strengthened crucial aspects of the People's case." (*Burroughs, supra*, 6 Cal.App.5th at p. 412.) Nor is it like *People v. Yates, supra*, 25 Cal.App.5th at pp. 487-488, where "volumes of incompetent expert testimony" constituted "most of the evidence in support of the jury's SVP finding." There is no indication that the references to other complaints in the reports affected the outcome.

*Walker v. Superior Court*, *supra*, 12 Cal.5th 177, is instructive. There, our Supreme Court found the defendant was prejudiced by "the admission of the hearsay descriptions regarding the nonpredicate offenses" because they "materially affected the outcome of the probable cause hearing, i.e., it is reasonably probable that, absent the erroneously admitted hearsay, the trial judge would not have entertained a strong suspicion that Walker qualified as an SVP." (*Id.* at p. 206.) The court noted that while some of the properly admitted evidence

14

supported a finding of probable cause, other evidence "cut against" it. (*Id.* at p. 207.)

In contrast here, there was no dispute that Aguirre had qualifying convictions and a diagnosed mental disorder, and virtually all the evidence showed he would be a danger if released. As we held in *People v. Hoffman* (2021) 61Cal.App.5th 976, 979, "'old age,' standing alone, does not relieve a person from SVP commitment" but "is *a* factor to be considered by mental health professionals and the trier of fact in coming to an SVP determination." Aguirre committed sexual offenses despite his advanced age, denied responsibility, lacked insight into his conduct, did not participate in treatment, and equivocated as to whether he would participate in therapy if released. He has not shown that he was prejudiced by inadmissible hearsay because it is not "likely that this evidence prejudicially affected the trial court's determination." (*Walker v. Superior Court*, *supra*, 12 Cal.5th at p. 207.)

### *Cumulative error*

Aguirre contends the combined effect of the asserted trial errors deprived him of a fair trial. (*People v. Hill* (1998) 17 Cal.4th 800, 847.) "'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'" (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) Aguirre is entitled to a fair trial, not a perfect one. (*People v. Peyton* (2014) 229 Cal.App.4th 1063, 1080.) Any error in excluding evidence of parole conditions or in admitting hearsay did not deny Aguirre due process or a fair trial.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

TANGEMAN, J.

We concur:

YEGAN, Acting P. J.

PERREN, J.

16

Michael J. Carrozzo, Judge

Superior Court County of Santa Barbara

——————————————————

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.